CATHERINE GAVIN, RESPONDENT, v. STANLEY FORREST AND WEISSEN-BORN COAL COMPANY, A CORPORATION, APPELLANTS.—72 S. W. (2d) 177.

St. Louis Court of Appeals. Opinion filed June 5, 1934.

*Wilton D. Chapman* for appellants.

664

*Eagleton, Henwood & Waechter* and *Frank P. Aschemeyer* for respondent.

McCULLEN, J.—This is a suit for damages brought by respondent, hereinafter referred to as plaintiff, for the death of her husband. The suit was originally instituted against three defendants. A trial before the court and a jury resulted in a verdict and judgment in favor of plaintiff and against the three defendants, in the sum of $7500. Defendants Stanley Forrest and Weissenborn Coal Company

bring the case to this court by appeal. Defendant George Thomas did not appeal.

Plaintiff's amended petition alleged that she and Thomas Gavin were lawfully married and were living together as man and wife on November 6, 1930, on which date the said Thomas Gavin was injured and killed; that Whittier Street and Kennerly Avenue were open and public streets in the City of St. Louis, Missouri; that Whittier Street runs north and south, and Kennerly Avenue runs east and west and intersects Whittier Street. The petition charged that defendants Stanley Forrest and Weissenborn Coal Company were the owners of a coal truck which was being driven northwardly on Whittier Street; that defendant George Thomas was the operator of a Lincoln car, which was being operated eastwardly on Kennerly Avenue; that plaintiff's husband was the owner of a Ford coupe, which was being driven southwardly upon Whittier Street.

Plaintiff alleged that on the date mentioned, while her husband was driving the Ford coupe southwardly on Whittier Street, the coupe was collided with by the Lincoln car driven by defendant George Thomas; that thereafter the Ford coupe was struck by the coal truck operated by defendants Stanley Forrest and Weissenborn Coal Company, through their agent and chauffeur, as a result of which plaintiff's husband was thrown from the Ford coupe and was later struck and run over by said truck, causing him to sustain such injuries that he was immediately killed.

The amended petition contained five assignments charging negligence against all of the defendants. The fifth assignment of negligence charged negligence under the humanitarian doctrine for failure of defendants to stop, slacken the speed of, or swerve their automobiles so as to avoid the collision with the Ford coupe.

The separate amended answer of defendants Stanley Forrest and Weissenborn Coal Company contained a general denial, coupled with a plea of contributory negligence, charging that plaintiff's husband negligently operated his automobile at a high, excessive and dangerous rate of speed under the circumstances, and at such a rate of speed as to endanger the life and limb of persons on the street, including himself; that plaintiff's husband negligently failed to exercise the highest degree of care to discover defendant George Thomas and his Lincoln automobile upon the street; that he negligently failed to keep his automobile under such control that it could be readily and reasonably stopped; that he negligently failed to swerve his automobile so as to avoid the collision, but on the contrary, negligently did swerve it so as to cause the collision; that he negligently failed to sound his horn or give any signal of the approach of his automobile at said intersection, when, in the exercise of the highest degree of

care he could have done so and thereby could have avoided the collision.

The fifth paragraph of the amended answer of the two defendants above named contained the elements of a charge against plaintiff's husband of negligence under the humanitarian doctrine, for failure to stop, slacken the speed of, or swerve his automobile so as to avoid the collision with the Lincoln automobile driven by defendant Thomas.

It was admitted that Mr. Gavin died as a result of the injuries which he sustained when he was run over by the coal truck of the two defendants named, and that at the time of his death he was twenty-seven years of age and was earning regular plumber's wages of about $65 per week, of which he was contributing $50 or $55 per week to the support and maintenance of plaintiff as his wife in their home.

Defendant George Thomas was called as a witness for plaintiff and testified in substance that about 7:35 on the morning of November 6, 1930, he was driving his Lincoln automobile eastwardly on Kennerly Avenue, toward Whittier Street. He was accompanied by his wife. As he approached the intersection of the two streets he was about in the center of Kennerly Avenue, going about fifteen miles an hour. There is no car track on either of the streets. He looked to the south and saw a coal truck coming north toward Kennerly Avenue. When Thomas got about even with the west curb line of Whittier Street, the coal truck was about fifty yards "or something like that" south of Kennerly Avenue. Thomas said he looked to the north and saw a Ford coupe, "Right in front of me." His testimony was to the effect that the collision between his Lincoln car and the Ford coupe, driven by Gavin, took place about in the center of the intersection. He was asked if his machine struck the Ford, and answered: "No, sir. He struck the front part of my bumper." He further testified that his automobile did not move over three or four feet after he discovered the Ford in front of him. He said he watched the truck coming north on Whittier Street, and that the Ford and the truck collided a little before the truck got to the intersection; that after the Ford struck his car, the Ford whirled to the east side of the street, and then went whirling back to the west side and turned sideways toward the truck, "and when they come in contact the truck hit half a foot behind the door;" that Gavin then fell out of the Ford and the truck ran over him. He admitted that in his deposition, taken before the trial, he had testified that when the collision occurred between his Lincoln car and the Ford coupe, the coal truck was "about" one hundred yards away. Explaining this, he stated that when his deposition was taken he was "estimating" the distance. He said the truck was moving north in Whittier Street at a speed of between ten and fifteen miles an hour. Later on in his testimony he

said the coal truck was moving between fifteen and eighteen miles per hour at that time. He said that in his opinion the Ford coupe was going about twenty-five or thirty miles an hour when he first saw it; that he heard no horn or any other signal given by Gavin. He testified that the weather on the day of the accident was bright and clear.

William Bruton, a chauffeur employed by the St. Louis Lumber Company, was called as a witness for plaintiff, and testified that on the day mentioned he was driving a Mack truck northwardly on Whittier Street, and as he got to about St. Ferdinand Avenue, which is one block south of Kennerly Avenue, defendants' coal truck, also going north on Whittier Street, passed him. The witness said that at that time he was driving his truck about twenty miles per hour; that when the coal truck passed his truck, the coal truck got just a little bit over past the middle of Whittier Street and that he, the witness, drove his truck so that he could see past the driver of defendants' truck to "see if anybody was coming," because the intersection of Whittier Street with Kennerly Avenue was near. He testified that the Ford in which Gavin was riding was moving south and the Lincoln car was moving east; that the Lincoln car hit the hind bumper and fender of the Ford and pushed it around, and the Lincoln ran right on past the Ford and came to a stop on the southeast corner of Whittier and Kennerly; that when the Ford was struck by the Lincoln, the Ford was pushed to the east side of the street, two or three feet past the middle, which brought it in the line where the truck of defendants was moving north. The witness was asked: "Did the truck have room to pass between the right-hand curb?" and answered: "He had room to miss the coupe if he had swung the truck at all." He testified that when the Ford got into the position described it was headed southwest, and was stopped. He said that at that time defendants' truck was eighty or ninety feet south of the Ford. The witness said he stopped his own truck without any difficulty; that when defendants' truck hit the Ford Coupe, the truck kept going until it got "pretty near across the intersection." He said the defendants' truck did not swerve, but went straight and did not slacken speed. When asked what became of the driver of the Ford when the truck hit the Ford, the witness said:

"It just knocked him right out. He went out on his head about the middle of the truck and the truck kept going and ran over his head with the hind wheel."

This witness testified that a truck, such as defendants' truck, going at twenty miles an hour, could be stopped within fifteen or twenty feet on a dry street, and that the street in question was dry on that morning.

It was admitted that a plat, plaintiff's Exhibit E, which was introduced in evidence, correctly showed the width of the two streets

as follows: Kennerly Avenue just east of Whittier Street thirty-six feet one inch wide, and from the west side Kennerly Avenue forty-six feet one inch wide, Kennerly Avenue being ten feet wider at the west side than it is to the east. Whittier Street is thirty-six feet one inch wide. The two streets intersect at right angles.

Virgil Stigger, an employee of defendant Weissenborn Coal Company, testified that he was on defendants' truck at the time of the collision; that the truck was being driven by Henry Simon and they were on their way to deliver a load of coke, which was on the truck and weighed about two and one-half tons. He said the Lincoln car hit the Ford and knocked Gavin out of the Ford, or that he fell out; that the coal truck was about ten feet south of the point where the Lincoln car and the Ford car collided at the time of that collision; that the two cars named struck first and then "the Ford hit the truck;" that the Lincoln car knocked the Ford car up against the truck; that Gavin fell between the front and back wheel of the truck; that the Lincoln car was going about thirty miles an hour, and the truck about eight miles an hour; that the truck moved about two or three feet after it had run over Gavin. He testified that there was no room on the right-hand side and no room on the left-hand side to permit the truck to pass the Ford car in the intersection. The witness said that the truck came to a complete stop and the accident was entirely over before the truck got to Kennerly Avenue; that after the accident was over and the truck was stopped, the truck was eight feet south of Kennerly Avenue.

Garnet M. Conley, an employee of defendant Weissenborn Coal Company, testified that he was on the seat of the truck with the driver and witness Stigger at the time of the accident; that as the truck approached the intersection it was being driven about eight miles an hour; that the Lincoln car approaching from the west, going east, swerved to the north curb as if to pass the Ford car and collided with the right rear wheel of the Ford car, knocking it into the path of the truck; that when the Lincoln car struck the Ford car, the truck was a distance of about ten or twelve feet to the south of Kennerly Avenue, and about fifteen feet south of the point where the Ford car and the Lincoln car collided; that the truck stopped immediately; that there was no room for the driver of the truck to turn his car or to go around the Ford car, and that there was not time for the driver of the truck to do so; that the Lincoln car was traveling about twenty-five to thirty-five miles an hour, and the Ford was traveling about the same rate of speed.

Edna Freesmeier, called as a witness for defendants, testified that she was driving an automobile southwardly on Whittier Street, behind the Ford car driven by Gavin; that Gavin's Ford was being driven not over twentey-five miles an hour; that her car and Gavin's

car were a little to the right of the center of Whittier Street. Gavin's car went across the intersection, and the witness happened to glance up, "and saw this large car tearing down the street. He was going about thirty miles an hour." She was asked: "Was that the Lincoln?" and answered:

"Yes, sir. I threw my machine out of gear and jumped on my brake. At that time the Lincoln hit the back of the Ford and spun it around until it was facing the southeast corner. I got out of my machine and started walking across the street because I didn't think the Lincoln was going to stop because he continued straight across the street and I wanted to get the license number because he was going so fast I didn't think he was going to stop."

She gave further testimony which was to the effect that the coal truck ran into the Ford car after the Ford car had come to a stop and while Gavin was attempting to get out of the Ford, and that Gavin then fell out of the Ford and under the coal truck. Defendants, at this stage of the proceedings claimed surprise on the ground that the testimony of the witness, with respect to the manner in which the accident actually happened, was in direct conflict with testimony which she had given at the coroner's inquest, and in conflict with a statement which she admitted she had signed shortly after the accident. Counsel for defendants were permitted by the court to cross-examine the witness at great length concerning her prior testimony and the statement referred to.

It appears from the cross-examination of this witness, which ensued after defendants' counsel claimed surprise, that the witness had testified at the coroner's inquest that the left side of the coal truck was about six feet from the east curb of Whittier Street, and was at the intersection of Whittier Street and Kennerly Avenue when the Ford car and the Lincoln car collided, and that the coal truck ran over Gavin before the coal truck and Gavin's Ford car collided. It appears that witness' testimony at the coroner's inquest was to the effect that it was the first impact which caused Gavin to be thrown from his car, and that she there had testified that before the truck hit Gavin's Ford car, the wheels of the truck "passed over his head."

With respect to the conflict between her testimony at the trial and her statements shortly after the accident, she testified as follows at the trial:

"MR. CHAPMAN (Q.): So that it wasn't true, then, that the Ford was struck by the Lincoln sedan, knocking the driver of the Ford out of the left door to the asphalt paved street, and as he fell to the street the left front wheel of a truck loaded with coke ran over the driver; that wasn't true, was it? A. I didn't say it wasn't true. That was the impression I had.

"Q. The same day this accident happened; that was your best im-

pression of how the accident happened? A. That was the statement I gave down there.

"Q. To the police the very day of the accident? A. Yes, sir.

"Q. And in that statemente you said that 'As he fell to the street the left front wheel of the truck ran over his head;' is that right? A. I don't remember which wheel. I know the wheel of the truck went over his head.

"Q. Look at your statement and see if that will refresh your memory as to how this accident did happen. Did it happen the way you have described it there? A. No, sir. After I got home I thought about that. I was in bed for two weeks after that accident. After I thought things over and tried to visualize that accident again I knew he wasn't knocked out that door, but that he jumped."

The witness further testified that at the time her statement was taken, she was "terribly hysterical."

Henry Simon, an employee of Stanley Forrest, one of the defendants herein, driver of the coal truck, testified that on the day in question the truck was loaded with three tons of coke; that as he was driving the truck northwardly on Whittier Street, he was going about eight miles an hour as he reached Whittier Street and Kennerly Avenue; that the Lincoln car hit the Ford car and drove the Ford car against the truck. He said that when the crash came between the Lincoln car and the Ford car, if the truck had been one foot farther in the intersection, the Lincoln car would have hit the truck. He said that when the Lincoln car hit the Ford car, he put on his brakes and stopped the truck within two and one-half or three feet; that Gavin fell under the rear wheel on the left-hand side of the truck with his face down. He was asked if there was any room for him to turn the truck either way to avoid the accident, and answered: "There wasn't no room, and there wasn't no chance, because, just like that, before I had time to do anything." He said the Ford car was moving at the rate of twenty-five to thirty miles an hour.

There was testimony by other witnesses, but we do not believe it is necessary to set it forth here.

Plaintiff submitted her case to the jury solely on the assignment charging negligence under the humanitarian doctrine, thereby abandoning all other assignments of negligence.

Defendants contend that the court committed error in submitting the case to the jury on the doctrine above mentioned, and argue in support of their contention that the evidence was not sufficient to make a case for plaintiff within that doctrine.

In this state of the record the correctness of the court's action in submitting the case to the jury on the humanitarian doctrine must be determined in the light of the rule applicable in passing upon a demurrer to the evidence. We must, therefore, take plaintiff's evi-

dence as true, give plaintiff the benefit of all reasonable favorable inferences arising therefrom, as well as the benefit of any favorable inferences arising from defendants' evidence, and disregard defendants' evidence wherein it is in conflict with plaintiff's evidence. This rule has been declared and applied so often that no authorities need be cited here to support it. Applying the rule to the evidence before us, we are of the opinion that there was substantial evidence to warrant the action of the court in submitting the case to the jury under the doctrine mentioned.

The testimony of defendant George Thomas shows that when the collision between his Lincoln car and the Ford car occurred in the center of the intersection, defendants' truck was at that time fifty yards south from the point of that collision. Later on he said the truck was "about" one-hundred yards south of the point of the collision just mentioned.

The testimony of William Bruton shows that defendants' coal truck was eighty or ninety feet south of the point where the Lincoln and the Ford collided when that collision occurred, and that defendants' truck was going somewhat faster than twenty miles an hour, and that when the Lincoln struck the Ford it caused the Ford to be thrown into the path of the oncoming truck. There was nothing, so far as the evidence discloses, to prevent the driver of the truck from seeing the collision between the Lincoln and the Ford cars, which caused the Ford to be thrown in the path of his truck, nevertheless, according to the testimony of William Bruton, defendants' truck continued on across the intersection without slackening speed and without turning in either direction, although, as this witness testified:

"He had room to miss the coupe if he had swung the truck at all."

This testimony was in direct conflict with the testimony of defendants' witnesses, but under the rule above stated, we must take only the evidence favorable to plaintiff as the basis of our decision on this point.

The evidence thus presented, coupled with the further testimony of witness Bruton to the effect that a truck such as defendants' truck, under the conditions present on that morning, could have been stopped within fifteen or twenty feet, as well as the testimony of some of defendants' witnesses, who said that the truck was moving at a speed of only eight miles an hour, and that it stopped within three or four feet after the collision with the Ford, was, in our opinion, ample evidence to warrant the court in submitting the case to the jury under the humanitarian doctrine. Under all the evidence it was a question for the jury to determine whether or not defendants' driver, by exercising the highest degree of care, could have stopped his truck or slackened the speed thereof, or swerved it in time to have avoided running over the deceased, after he saw, or by exercising the highest

degree of care could have seen him in a position of imminent peril. [Banks v. Morris, 302 Mo. 254, 257 S. W. 482; Quinn v. Berberich (Mo. App.), 51 S. W. (2d) 153; Nagle v. Alberter (Mo. App.), 53 S. W. (2d) 289; Jageles v. Berberich (Mo. App.), 20 S. W. (2d) 577.]

Defendants complain of the action of the court in refusing to give instructions A and B which they offered. Instruction A was one on contributory negligence, and told the jury that if they believed that plaintiff's husband failed to give warning of the approach of his automobile, and that such failure on his part directly caused or contributed to cause the collision and the death of plaintiff's husband, then the verdict must be for defendants. Instruction B was also based on contributory negligence, and told the jury that if they believed that plaintiff's husband was not operating his automobile in a careful and prudent manner, and was not exercising the highest degree of care and was not operating his automobile at a rate of speed so as not to endanger the property or life or limb of any person, and that such conduct on his part directly caused or contributed to cause the collision and the death of plaintiff's husband, then their verdict must be for defendants.

The court committed no error in refusing these instructions. When plaintiff submitted her case to the jury solely on the humanitarian doctrine, contributory negligence ceased to be an issue in the case.

In Schulz v. Smercina, 318 Mo. 486, 1 S. W. (2d) 113, 120, our Supreme Court said:

"The very nature of the humanitarian rule precludes contributory negligence from being an issue in the case. So, even if it be said that these instructions (9 and 10) do not make contributory negligence an absolute defense in this action, they do inject the issue of contributory negligence, and require the jury to determine the issue. Any instruction which injects a totally foreign issue into a case is not only erroneous, but dangerous and harmful. Contributory negligence is an issue wholly foreign to a case submitted purely under the humanitarian rule. Its injection was reversible error." [Schulz v. Smercina, supra.]

The instructions on contributory negligence were properly refused. [See also Gray v. Columbia Terminals Co. (Mo.), 52 S. W. (2d) 809; Silliman v. Munger Ldy. Co. (Mo.), 44 S. W. (2d) 159, 163.]

Defendants next contend that the court erred in refusing instruction C, which they offered. By this instruction defendants sought to have the court tell the jury that if they believed that while defendants were exercising the highest degree of care in operating their coal truck, the automobile of plaintiff's husband suddenly and unexpectedly came into a position of peril, then in order to charge defendants with a duty to avoid injuring him, plaintiff must show by a pre-

ponderance of the evidence that the circumstances were of such a character that defendants, "had a reasonable opportunity to become conscious of the plaintiff's peril, and a reasonable opportunity, in the exercise of the highest degree of care, to avoid an accident and injury. And if the jury further believe, from the evidence, that the facts as shown by the evidence did not charge said defendants with a duty as thus defined, or if the jury believe from the evidence that said defendants did not have a reasonable opportunity, in the exercise of the highest degree of care to perform such duty as thus defined, then you should find the issues for said defendants."

We are of the opinion that the action of the court in refusing to give this instruction was not error. In the first place, it erroneously refers to "plaintiff's peril" instead of the peril of plaintiff's deceased husband. This confusing mistake in the instruction, alone, was sufficient to take out of the category of reversible error, the court's action in refusing it. However, overlooking that error in the instruction and assuming that it was intended to refer to Gavin instead of plaintiff, it is further erroneous in that it ignores the duty of the defendants to exercise the highest degree of care to avoid the injury and consequent death of Gavin after defendants saw, *or by exercising such care, could have seen* Gavin in a position of imminent peril. The instruction, as phrased, required the jury to find by a preponderance of the evidence, as a prerequisite to a verdict for plaintiff, that the circumstances were of such a character that defendants had a reasonable opportunity "to become conscious of the plaintiff's peril." This was incorrect. The jury might thereby have been misled into believing that it was necessary for them to find that defendants knew of Gavin's peril, before they could find a verdict for plaintiff, whereas, under the humanitarian doctrine, upon which the case was submitted, more was required of defendants in the situation shown by the evidence. Under this instruction the jury may have been led to believe that no duty rested upon defendants to do anything to avoid the injury to Gavin until they became "conscious," or in other words, until they knew of his position of imminent peril, whereas, it was their duty under the law to discover Gavin's position of peril, if, by the exercise of the highest degree of care they could have done so. The evidence which showed that Gavin either fell out of or was thrown from his Ford car right in the path of defendants' oncoming truck was sufficient, if believed, to charge defendants' driver with seeing that which, in the exercise of the highest degree of care he could have seen, regardless of whether he actually saw it or not. [Quinn v. Berberich (Mo. App.), 51 S. W. (2d) 153, 155; Banks v. Morris, 302 Mo. 254, 257 S. W. 482.]

The instruction not having been correct in all respects, it was not reversible error for the court to refuse to read it to the jury. [Sneed

v. Shapleigh Hdw. Co. (Mo. App.), 242 S. W. 696, 700; Roberson v. Biscuit Co. (Mo. App.), 285 S. W. 127, 130; Linton v. St. Louis Lightning Rod Co. (Mo. App.), 285 S. W. 183, 187.]

Defendants complain that plaintiff's instruction No. 1 was erroneous in that it embodied an issue of primary negligence along with the law applicable to the humanitarian doctrine, and that by reason thereof it was error for the court to refuse to give their instructions A and B on contributory negligence. Instruction No. 1 is lengthy and we see no necessity for setting it forth here. We have read the instruction with care and we are unable to find therein any submission of primary negligence. The instruction required the jury to find, as a prerequisite to a verdict for plaintiff, all the necessary elements of the humanitarian doctrine arising under the pleading and the evidence, and submitted no other issue to the jury.

Further complaint is made of plaintiff's instruction No. 1, in that it set the degree of care required of defendants as the highest degree of care, whereas, defendants contend that they were required to exercise only ordinary care. This question was squarely decided by our Supreme Court in Gude v. Weick Bros. Undertaking Co. (Mo.), 16 S. W. (2d) 59, wherein the court held that in determining whether an operator of a motor vehicle was guilty of negligence under the humanitarian doctrine, the operator of such motor vehicle must be held to exercise the highest degree of care under Laws of Missouri 1921 (1st Extra Session), page 91, section 19. [See also Bruce v. East Side Packing Co. et al. (Mo. App.), 6 S. W. (2d) 986, 987.]

Defendants very earnestly insist that the court committed error in overruling their motion for a new trial. They contend that the motion should have been sustained on the ground that the jury were influenced and prejudiced against defendants through the fraud, deceit and perjured testimony of witness Edna Freesmeier. It is pointed out by defendants that this witness was called before the coroner's jury, where she testified under oath that she saw the collision between the Ford and Lincoln automobiles; that she saw the Ford pushed into the left front of the coal truck, and that before the truck and Ford car came together plaintiff's husband fell out and underneath the rear wheel of the truck; that the truck was as far over to the righthand side of the street as possible. Reference is made by defendants to a written statement, acknowledged by said witness to have been signed by her, which was in accord with her testimony given before the coroner's jury. It is argued by defendants that, relying upon the said witness to tell the same story at the trial herein as she had told before the coroner's jury, and as related in her statement, they called her as a witness in their behalf and that instead of telling the same story with respect to the accident as she had

told at the coroner's inquest, her testimony at the trial was in direct conflict with her prior statements and evidence.

Defendants argue that as a result of this witness' testimony, the jury's verdict was not based on a fair and impartial trial and that the trial court's refusal to grant a new trial was contrary to the provisions of section 1002, Revised Statutes of Missouri, 1929 (Mo. St. Ann., sec. 1002, p. 1264) which provides, among other things, that the court shall grant a new trial where there has been, "a fraud or deceit practiced by one party on the other, or the court is satisfied that perjury or mistake has been committed by a witness, and is also satisfied that an improper verdict or finding was occasioned by any such matters, . . ."

It appears from the record that when defendants' counsel claimed surprise after the witness had testified contrary to their expectations, the trial judge permitted them the widest possible latitude in cross-examination of the witness. They were permitted to examine her at length with respect to the prior statements which she had made, and the prior testimony which she had given.

Furthermore, the court gave an instruction to the jury at the request of defendants, in which the jury were told that they were the sole judges of the credibility of the witnesses and of the weight to be given to their testimony. The jury were further told in the instruction that if they believed any witness had knowingly sworn falsely to any fact or facts material to the issues in the case, they were at liberty to reject all or any portion of such witness' testimony.

All these matters were unquestionably in the mind of the trial judge when he came to consider defendants' motion for a new trial, wherein defendants set forth in full their contention charging that the witness had been guilty of fraud, deceit and perjury to the surprise of the defendants and their attorneys.

With defendants' contention and supporting documents clearly before him, the trial judge overruled defendants' motion for a new trial.

The granting or refusing of a new trial on the ground of alleged perjury of a witness is a matter which the law leaves to the sound discretion of the trial judge. The very language of the statute, set forth above, clothes the trial judge with a wide discretion which is to be exercised by him in favor of granting a new trial when he "*is satisfied* that perjury or mistake has been committed by a witness, *and is also satisfied that an improper verdict or finding was occasioned by any such matters.*"

The function of an appellate court in determining whether or not a new trial should be granted on the ground of alleged perjury by a witness is entirely different from that of a trial judge in passing upon such a matter. The trial judge who saw the witnesses at the trial,

heard their testimony, observed their demeanor on the witness stand and who saw the reaction, or lack of reaction of the jury to the evidence and to the various happenings and incidents during the progress of the trial, is in a far better position to determine whether or not a witness complained of gave false testimony amounting to perjury, and whether or not such testimony brought about an improper verdict, than any appellate court could be. Our courts have frequently held that the decision of such questions is vested by the law exclusively in the trier of the facts and the only question to be determined in such a situation by an appellate court is whether or not, upon the record, it clearly appears that the trial judge, in exercising his function in this regard, abused the discretionary power vested in him. An appellate court has no authority whatsoever to interfere with a trial judge's action on such a question, unless it clearly appears that his action was so arbitrary and unjust as to amount to an abuse of the discretion vested in him by the law.

By his ruling in this case it appears the trial judge was not "satisfied" that an improper verdict was occasioned by the alleged perjury of the witness complained of and we find nothing in the record which would warrant us in convicting the trial court of an abuse of discretion in reaching that conclusion. It is true defendants showed that the testimony of the witness at the trial was in conflict with her prior statements and evidence with respect to some of the important facts in the case, but it must be remembered that she was not called as a witness by plaintiff. She was put upon the stand by defendants themselves after plaintiff had completed her case in chief. In undertaking to explain and account for the conflict between her prior statements and her testimony, the witness said that she was "terribly hysterical" after having witnessed the accident and that she was required to remain at home in bed for a period of two weeks thereafter. Such explanation may, or may not, in the minds of the jurors, have satisfactorily accounted for her change of testimony, but that was a matter exclusively within the province of the jury, and her testimony, as well as her explanations were no doubt given such consideration by the jury under the court's instruction as the jury thought they were entitled to. In the absence of anything further appearing in the record with respect to the testimony of the witness, we cannot say that the witness committed perjury and that the trial court abused its discretion in overruling defendants' motion for a new trial. [Neal v. Kansas City Rys. Co. (Mo.), 229 S. W. 215, 218; Asadorian v. Sayman (Mo. App.), 282 S. W. 507, 511; Davis v. Quermann (Mo. App.), 22 S. W. (2d) 58, 59.] As we view this record the testimony of the witness mentioned might be entirely disregarded and still there would be sufficient evidence remaining to warrant the verdict reached by the jury. In this state of the record we are unable to see how we could

678

hold that the trial judge committed reversible error when he ruled, in effect, that the conduct and testimony of the witness did not cause an improper verdict.

We find no reversible error and the judgment is, therefore, affirmed. *Hostetter, P. J.*, and *Becker, J.*, concur.