Louis J. CHIODINI (Plaintiff), Respondent,

v.

TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, (Defendant), Appellant.

No. 29338.

St. Louis Court of Appeals.

Missouri.

Feb. 21, 1956.

Warner Fuller, Arnot L. Sheppard, St. Louis, for appellant.

Hay & Flanagan, E. D. Franey, S. D. Flanagan, St. Louis, for respondent.

HOUSER, Commissioner.

This is an action for damages brought against Terminal Railroad Association of St. Louis for personal injuries sustained by Louis J. Chiodini while standing on a train platform in Union Station. From a judgment for $3,950 entered on a jury verdict the railroad association has appealed.

The petition alleged in paragraph II that while plaintiff, a Pullman conductor engaged in the performance of his duties, was standing on a station platform alongside a Pullman car in a train of the Missouri Pacific Lines which was standing on a track for the purpose of taking on passengers "he was hit, struck and collided with by a truck or bull wagon which the defendant, its agent and servant, were then and there operating along and upon said platform" and was thereby injured. In paragraph III plaintiff charged negligence in

separately numbered subparagraphs as follows: (1) excessive speed, (2) failure to warn, (3) failure to keep the truck under control, (4) failure to keep a vigilant lookout, (5) failure to swerve, (6) failure to stop, (7) "That defendant negligently and carelessly caused, allowed and permitted said truck or bull wagon to strike and collide with plaintiff while plaintiff was standing on said platform alongside said Pullman car, * * *," and (8) humanitarian failure to stop, slacken speed, swerve or warn. Defendant's answer was a general denial, amended prior to trial to allege contributory negligence.

For the purpose of loading and unloading passengers, mail and baggage, provision is made for trains to back into Union Station on 42 parallel north and south tracks. The tracks are separated in pairs by concrete platforms of sufficient height above the level of the tracks to make it easy for passengers to step onto or off the railroad car steps. The concrete platforms, 12–14 feet wide, run north and south, parallel to the tracks, their east and west edges being about flush with the sides of the railroad cars. At the north end of these concrete platforms and at the same level a concrete passageway approximately 40 feet wide runs in an east-west direction to accommodate all 42 tracks. The fence and gates which divide the railroad yards from the station waiting room and through which passengers entrain and detrain, run along the north side of this passageway. In order to transport mail and baggage from place to place over the concrete platforms and passageways defendant used rubber-tired four-wheel trucks known as bull wagons, which were coupled together as trains and pulled by gasoline powered tractors operated by defendant's employees. The bull wagons were approximately 3½ feet wide, 8 or 10 feet long, their beds 3½ feet high and their sides 3 feet high around the bed. The tractors are about 7 feet long.

On the day in question plaintiff reported for duty at 5 o'clock, scheduled to leave on Missouri Pacific Train No. 1, the Texas Eagle, at 5:45 p. m. The train was standing on track 7, on the east side of the con-

crete platform between tracks 6 and 7. Shortly before the departure of the train plaintiff descended the steps on the west side of one of the Pullman cars in the train. As he did so he faced west and was looking directly west toward the concrete platform. He was holding to the hand holds when he reached the bottom step. At that time he looked to his right (to the north) and saw nothing. In that direction he could see all the way to the gate, a distance of approximately 195 feet, and he saw no tractor or truck anywhere on the platform between him and the gate. Then he stepped down to the concrete platform and looked to his left (to the south). He saw nothing coming from either direction. He stood "right up against" the west side of the Pullman car. He was standing perfectly still and did not move his feet, arms or body other than to twist his head to look south. After standing there and in that position for approximately a half minute he turned his head "and this here ('about three' bull wagons coupled to a tractor) was right in front of me and hit me." Plaintiff did not see the tractor before he was hit. He did see the tractor when—"at the time" —he was hit. The tractor-bull wagon train was running south at the time. Plaintiff was struck on the right chest, not by the tractor but by the left front end of the first bull wagon behind the tractor, and knocked down.

Plaintiff's assignments of negligence 1 to 6, both inclusive, and 8, supra, were abandoned in the submission. Plaintiff went to the jury solely on the negligence charged in subparagraph (7), supra. Plaintiff's verdict-directing instruction No. 1 follows:

"The Court instructs the jury that if you find and believe from the evidence that on or about the 10th day of June, 1953, plaintiff, Louis J. Chiodini, was employed as a Pullman conductor by the Pullman Company and that on or about said date, while performing his duties as such conductor, he was standing on a platform in Union Station, operated by the defendant, Terminal Railroad Association of St. Louis, near the south end of the second Pullman car from the rear end of Missouri Pacific Train No. 1 with his back close to the west side of said car, if you so find, and that while he was standing in said position, the defendant by and through one of its employees drove and operated a tractor, to which were attached certain trucks or bull wagons, in a southwardly direction on said platform toward plaintiff, and that defendant negligently and carelessly caused, allowed and permitted one of said trucks or bull wagons to strike and collide with plaintiff while he was standing in said position, if you so find, and that as a direct and proximate result thereof plaintiff was injured, and if your further find and believe from the evidence that plaintiff was at all said times in the exercise of ordinary care for his own safety, then your verdict should be in favor of plaintiff and against defendant."

Defendant's first and second points are that plaintiff failed to make a prima facie case of negligence; that this case is not a res ipsa loquitur situation and that plaintiff neither pleaded, proved nor properly instructed on specific negligence. While it is true that plaintiff did not and under the facts could not rely upon the res ipsa loquitur doctrine we cannot agree that plaintiff failed to allege, prove and submit a prima facie case of specific negligence.

In fact situations authorizing the application of the doctrine of res ipsa loquitur, where the physical facts and circumstances surrounding an unusual occurrence resulting in injury are sufficient to justify an inference of some kind of negligence for which the defendant should be held responsible but are insufficient to point to the specific negligent act or omission, allegations similar to those in paragraph III subparagraph (7) of plaintiff's petition have been held to charge general, and not specific, negligence. Price v. Metropolitan St. R. Co., 220 Mo. 435, 119 S.W. 932; Briscoe v. Metropolitan St. R. Co., 222 Mo. 104, 120 S.W. 1162; Stauffer v. Metropolitan St. R. Co., 243 Mo. 305, 147 S.W. 1032; Nagel v. United Rys. Co. of St. Louis, 169 Mo.App.

284, 152 S.W. 621; Austin v. Simon, Mo. App., 204 S.W. 193; Bergfeld v. Kansas City Rys. Co., 285 Mo. 654, 227 S.W. 106; Porter v. St. Joseph Ry. Light, Heat & Power Co., 311 Mo. 66, 77 S.W. 913; Tabler v. Perry, 337 Mo. 154, 85 S.W.2d 471; Benner v. Terminal R. R. Ass'n of St. Louis, 348 Mo. 928, 156 S.W.2d 657; Bommer v. Stedelin, Mo.App., 237 S.W.2d 225.

■ In fact situations in which the doctrine of res ipsa loquitur is inapplicable and a case of specific negligence is sought to be stated the extent to which plaintiff must particularize depends upon the circumstances. There are some fact situations in which the act which results in injury or damage is so simple that the mere statement of the ultimate facts is nearly as specific an averment as can be expressed in words. Monan v. Arkansas Grocer Co., 216 Mo.App. 289, 264 S.W. 486; Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914; Boulos v. Kansas City Public Service Co., 359 Mo. 763, 223 S.W.2d 446, loc. cit. 449. Examples of specific negligence cases of this kind in which the pleadings alleged and the verdict-directing instructions, after describing plaintiff's position and environment, hypothesized little more than the ultimate facts relating to a simple act of commission, without reference to the conventional particularized acts of omission such as failure to stop, swerve, slacken, warn, maintain a lookout, control, etc., follow: Beier v. St. Louis Transit Co., 197 Mo. 215, 94 S.W. 876; Davidson v. St. Louis Transit Co., 211 Mo. 320, 109 S.W. 583; Thompson v. Keyes-Marshall Bros. Livery Co., 214 Mo. 487, 113 S.W. 1128; Miller v. United Rys. Co. of St. Louis, 155 Mo.App. 528, 134 S.W. 1045; Richardson v. Kansas City Rys. Co., 288 Mo. 258, 231 S.W. 938; State ex rel. Kansas City Rys. Co. v. Trimble, Mo.Sup., 260 S.W. 746; Stolovey v. Fleming, 320 Mo. 946, 8 S.W.2d 832, and other cases cited in Boulos v. Kansas City Public Service Co., supra, 223 S.W.2d loc. cit. 449 et seq.; Hughes v. East St. Louis City Lines, Mo. App., 149 S.W.2d 440; Jones v. Central States Oil Co., supra; State ex rel. Spears v. McCullen, 357 Mo. 686, 210 S.W.2d 68; Rosenblum v. St. Louis Public Service Co.,

Mo.App., 242 S.W.2d 304; Sullivan v. Kansas City Public Service Co., 363 Mo. 68, 248 S.W.2d 605, and Hughes v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 360.

■ In simple fact situations a recovery on the theory of specific negligence will be permitted to stand where plaintiff specifically charges, proves and submits the negligent commission of "a common law wrong by a specified person, under specified circumstances, at a specified place, in the doing of a specified thing, in a specified manner, the whole of which the law denominates as negligence." State ex rel. Spears v. McCullen, supra, 210 S.W.2d loc. cit. 71, a late decision of the Supreme Court en banc on this proposition. The simple fact situation involved in the last cited case was the act of the operator in driving the front end of a streetcar into the rear end of an automobile on the track ahead of the car. The essential fact and legal situation presented by the instant case is illustrated by Thompson v. Keyes-Marshall Bros. Livery Co., supra, an often cited case, long relied upon as an authority in this field. There the petition alleged that plaintiff was standing in Olive Street near the corner of Ninth Street waiting for a west bound streetcar

" 'when defendant, by its agents and servants, voluntarily ran a team of horses attached to a vehicle into and against the plaintiff; said horses knocking the plaintiff down and trampling her under their feet, thereby severely wounding and injuring plaintiff; that the injury to plaintiff was due to the carelessness and negligence of defendant's agent in driving said horses attached to said vehicle at the time and place aforesaid, and in violently running into and against plaintiff.' "

It was held that the petition stated a case of specific negligence under the common law, the court saying, 214 Mo. loc. cit. 493, 113 S.W. loc. cit. 1130:

"In what respect is that declaration wanting in specification? It describes the situation, the plaintiff's position

and the environments, and then says that the defendant drove its horses against her violently, knocking her down and trampling on her, and that it was due to the driver's negligence in driving the horses. What other act could she specify? Driving a team of horses at a rapid gait into a narrow space where people are standing in plain view of the driver, is prima facie evidence of negligence, and the statement of such acts accompanied with a charge of negligence is a specification of acts of negligence. * * * We do not see what more the plaintiff could have said than she did say to make out a charge of common-law negligence. * * *."

■■ Under these cases we are bound to hold in the instant situation that a prima facie case of specific negligence was made by showing that the operator of a large and heavy tractor-truck train simply drove it with force and violence into a human being who, for half a minute, had been standing stationary and motionless on a station platform where he had a right to be, in plain view of the driver. We conclude that subparagraph (7), supra, charges and Instruction No. 1 submits specific negligence under the facts of this particular case.

■ That plaintiff's Instruction No. 1 was a sufficiently specific hypothesization of facts in the face of the criticism that it gave the jury a roving commission is not to be gainsaid, in view of the holdings in Jones v. Central States Oil Co., supra, Sullivan v. Kansas City Public Service Co., supra, and cases of like tenor.

■ Defendant further suggests the failure of plaintiff to make a prima facie case on the ground that his testimony that he was struck by the bull wagon and not by the tractor is directly contrary to physical facts. This contention is based upon a photograph which shows the front and rear plates of the tractor to be wider than the front assembly of the bull wagon. From this it is argued that the back plate of the tractor could not have missed striking plaintiff and the bull wagon could not have struck him, as he testified, because the former was wider than the latter. No evidence was given as to the actual width of the tractor plate, nor was there any evidence that the tractor-truck train was driven in a straight line as it approached plaintiff or whether its course was changed immediately before plaintiff was struck. Had the tractor-truck train been operated at an angle as it approached and had the operator swerved the tractor to the right as it neared plaintiff (a possibility not excluded by the evidence) it would have been quite possible for the tractor to have missed and the bull wagon to have struck him. While it is true that where testimony, beyond any reasonable doubt, is contrary to established physical facts or laws and facts of common knowledge it cannot be accepted as substantial evidence, Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885, we do not believe that the photograph or record evidence removes all reasonable doubt of the possibility of the accident occurring in the manner in which plaintiff testified. We advert to the rule that courts should not indulge in arbitrary deductions from physical laws and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other conclusion. Lansford v. Southwest Lime Co., Mo.Sup., 266 S.W. 2d 564, and cases cited. In this connection respondent pertinently cites Walden v. Stone, Mo.App., 223 S.W. 136, to which we make reference.

■ Defendant further asserts that no submissible case was made because plaintiff's testimony was so manifestly false and so entirely beyond reason that it did not constitute substantial evidence. Defendant introduced evidence that plaintiff made several prior inconsistent oral and written statements that he was injured as he descended the steps and stepped off the bottom Pullman step into the side of the bull wagon. Dr. Spoeneman and Louis Miller, a night agent for the Pullman Company, so testified but in rebuttal plaintiff testified that Dr. Spoeneman did not ask him how the accident happened and that

he did not tell him; denied that he told Louis Miller that he was struck as he was stepping from the Pullman car, and stated that he told Mr. Miller that he was standing on the platform when struck. A typewritten report to Mr. Birch, Superintendent of the Pullman Company, signed by plaintiff, was rebutted by plaintiff's testimony that he neither dictated nor typed the report to Mr. Birch; that he cannot use a typewriter and had no typewriter at his home. In answer to the statements in a report to Mr. Callahan signed by plaintiff, the latter testified at the trial that he did not tell Mr. Callahan that he was struck as he descended the steps, did not read the report prepared by Mr. Callahan; that it was not read to him and that he did not hear Mr. Callahan dictate it to his stenographer. He further testified that although he signed it the report was not read by him and that he did not know its contents before he signed it. Plaintiff testified in rebuttal that a written statement signed by him and given to Mr. Hardaway, a claim agent for defendant, did not contain the statements he made to Mr. Hardaway; that after Mr. Hardaway wrote the statement it was not read to him and that he had not read it before he signed it. In answer to a leading question Dr. Crecelius testified that plaintiff told him he was injured when he stepped off the Pullman steps, but on redirect examination the doctor testified that plaintiff said he stepped off the Pullman onto the platform and then was hit. Defendant points to the following contradictions: Plaintiff's testimony that he could not sleep and his subsequent testimony that he took pills nightly for the relief of pain and slept comfortably every time he took a pill; that although tractors with bull wagons, operated by gasoline engines, were moving around on the passenger platforms during the 11 years he worked at the station he never at any time heard any noise made by them (which defendant claims is not acceptable "because everybody knows they make noise"); his testimony in his deposition that he saw the tractor in front of him and his later testimony in his deposition that he had not seen the tractor before, at the time, or after his accident that day, any time at all; and other conflicts, such as whether the Pullman car on which he was standing was equipped with retractable steps or not. The fact that plaintiff's testimony was contrary to the statements of defendant's several witnesses or revealed the inconsistencies noted in respect to ability to sleep, tractor noises, retractable steps, etc. does not necessarily convict plaintiff of perjury. The weight and value to be given to plaintiff's testimony, following defendant's attempt to impeach it and plaintiff's effort to offset the impeaching evidence, was for the jury to determine. Huffman v. Terminal Railroad Ass'n of St. Louis, Mo. Sup., 281 S.W.2d 863, loc. cit. 868, and cases cited. This case was tried before an able and experienced trial judge who had before him assignment 12 of the motion for a new trial that "The verdict is the result of perjury on the part of plaintiff." His action in overruling the motion for a new trial clearly indicates that he was not satisfied that perjury had been committed or that an improper verdict had been occasioned by perjury. Before interfering with his judgment in the matter his action must have been so arbitrary and unjust as to amount to an abuse of discretion. Gavin v. Forrest, 230 Mo.App. 662, 72 S.W.2d 177. There is nothing to indicate any abuse of discretion on the part of the trial judge.

■ Next, defendant complains of error in overruling defendant's objection to argument by plaintiff's counsel that the operator of the tractor was negligent in failing to sound a horn as a warning of its approach. It is said that failure to warn was not submitted as negligence, so that the argument was broader than the issues. The objection was as follows: "I don't think it should be argued, unless it is submitted" to which the court responded: "As to the negligence here, members of the jury, you will get the charge from the instructions, not what the lawyers say. Proceed." No other objections were made and no other or further rulings were requested. The court did not err in this connection. The only reasonable conclusion for the jury to draw from this exchange was that if

failure to blow a horn was not charged in the instructions it should not be considered as evidence of negligence on the part of defendant merely because plaintiff's lawyer sought to draw an inference of negligence from such failure. The court made it sufficiently clear that the jury should be guided by the instructions and not by the gratuitous suggestions of plaintiff's counsel. The action of the court was responsive to the suggestions of counsel and the court is not to be convicted of error under the circumstances for failure to take other and further curative steps not then sought by the party now complaining. State ex rel. Ratliff v. Morant, Mo.App., 271 S.W.2d 230, loc. cit. 233, and case cited; Forsythe v. Railway Express Agency, Mo.App., 125 S.W.2d 539.

■ The judgment is assailed on the ground that the court refused defendant's Instruction D which directed a verdict for defendant upon a finding that the tractor and trucks passed the train steps at or about the time plaintiff was descending the steps but before he had reached the platform and that as they passed they were in plain view of plaintiff; that he saw or could have seen them in time to have kept out of their way, but negligently failed to do so. The first paragraph of given Instruction No. 4 directed a verdict for defendant upon a finding that as he stepped to the platform the tractor-trucks passed and plaintiff negligently stepped into the side of one of the trucks. The second paragraph directed a verdict for defendant upon a finding that before plaintiff alighted from the Pullman car he saw or could have seen the tractor and trucks approaching in time not to have stepped down on the platform at that precise moment, and negligently failed to use such care. Defendant concedes that Instruction No. 4 is "similar in content" to Instruction D but contends that it was entitled to have its defense presented in the particular form in which it was requested, which it says was more advantageous to defendant. If there was any appreciable difference between the two instructions the advantage was that of defendant's. At all events the defense was adequately and fully covered by given Instruction No. 4, and this point must be disallowed.

■ Defendant's final point, that the $3,950 verdict is excessive, cannot be sustained, considering the evidence in the light most favorable to plaintiff. On June 10, 1953 plaintiff was struck in the right chest by a heavy bull wagon with sufficient force to knock him down into the space between the tracks and the station platform. He was dazed for an instant. His shirt was torn. Notwithstanding his injury he boarded his train and proceeded on the run to Fort Worth, Texas although he was suffering pain in his back, chest and left knee. He had not sustained any injury or suffered any pain in his chest, back or knee before that day. After the accident he could not dress himself like he should have because of pains when he moved his arms. On June 12 he returned to St. Louis. On June 15 he went from St. Louis to New York and on June 16 left New York for St. Louis. He also worked on June 19, 20, 23, 25, 26. After those trips he was "out"— "just couldn't make it no more." His breathing was "not so good." Every time he took a deep breath, it was "just like somebody trying to stick a knife into your chest." This went on for "quite a while." After June 26, he did no more work until October 8, 1953 for the reason that he was in pain and the doctor told him he needed rest and quiet. The bouncing and jostling of the trains, which were "pretty rough at times," aggravated his condition. Even after October he "could still feel it, bouncing around on trains kind of aggravated it again." Examined on June 22, 1953 by Dr. Spoeneman, a Pullman Company doctor, plaintiff had bruises on his chest, arm, back and knee. X-rays taken on June 25 and June 29 showed a minimal hypertrophic osteoarthritis of plaintiff's cervical and thoracic vertebrae. X-rays taken June 29 showed no evidence of fracture but some soft tissue swelling about the manubrial sternal junction.

Dr. E. D. Crecelius, plaintiff's family doctor, examined him on June 24. Plain-

tiff complained of pain in his back and chest in the region of his sternum and he was agitated and nervous. There was some muscle spasm and considerable tenderness over the middle part of his back, the thoracic region, and the lower end of his neck, with considerable tenderness and pain on pressure on the sternum. The doctor suggested an elastic bandage which was worn around plaintiff's chest for several months. He prescribed sedatives and ordered him not to work. Thereafter he saw plaintiff approximately every week for six weeks, then every two weeks for a month. The fourth month he saw plaintiff twice. In his opinion plaintiff's injuries were painful. He did not think plaintiff could work considering the pain he was having and his apparent inability to breathe, with pain on inspiration and expiration. He told plaintiff it was impossible for him to work for three or four months; that plaintiff "simply couldn't work." Just before the trial a further examination disclosed tenderness in the region of plaintiff's sternum and considerable tenderness along the thoracic spine near the sixth cervical vertebra. He stated that plaintiff had arthritis in his spine before the accident and that trauma to an area of the body where there is a pre-existing arthritic condition quite frequently causes the arthritis to flare up to the extent that the condition becomes painful. It was his opinion that the trauma suffered in the accident was the cause of the pain in his back and sternum; that both of these were permanent injuries and that plaintiff could expect to have pain in the future; that he thought there was considerable injury to the cartilaginous portion of the sternum in the distal half; that cartilaginous injuries are all of long duration and that those on the sternum are usually evidenced by pain over a period of time of from six to eighteen months. In addition to the prescription of capsules and the elastic band Dr. Crecelius gave him diathermy treatments "for quite a while." From June to October plaintiff suffered pain in the back, chest and left knee. At trial time in February, 1955 plaintiff was still complaining of a "gnawing" pain in his chest, back and knee which was sufficient to keep him from sleeping "a lot of times." Plaintiff lost earnings of $403 per month for approximately 3⅓ months. This, together with his medical bill of $100 and X-ray bill of $25, made his special damages amount to approximately $1,450. We do not consider $2,500 as an excessive award for plaintiff's injuries, pain and suffering. In 1935 this court sustained a verdict for $2,500 as not excessive in a case in which the injuries were quite comparable but in which no special damages were shown. Housley v. Berberich Delivery, Mo.App., 87 S.W.2d 209. Considering the rules laid down in Jones v. Terminal R. R. Ass'n of St. Louis, Mo.App., 246 S.W.2d 356, and Arl v. St. Louis Public Service Co., Mo.App., 243 S.W.2d 797, including particularly the fact that the trial judge considered but did not act on the suggestion that the verdict was excessive, it is clear that no remittitur is indicated.

It is the recommendation of the Commissioner that the judgment of the circuit court be affirmed.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, affirmed.

ANDERSON, P. J., and N. T. CAVE and GEORGE P. ADAMS, Special Judges, concur.