THE CITIZENS BANK OF LIBERTY, MISSOURI, APPELLANT, v. J. B. THOMPSON, RESPONDENT.—132 S. W. (2d) 700.

Kansas City Court of Appeals. October 30, 1939.

*Ryland, Stinson, Mag & Thomson,* and *R. E. Rosenwald* for appellant.

450

*Lawson & Hale* for respondent.

KEMP, J.—In this case, plaintiff (appellant) brought suit against defendant on his renewal note, the principal of which had been reduced to $1200. Defendant (respondent) filed answer and counterclaim. His answer admitted the execution of the note, but alleged payment. There was no evidence offered in support of this defense, and on this phase of the case the court directed a verdict in favor of the plaintiff for principal and interest in the sum of $1292.23, to which action of the court no complaint is made.

Defendant's counterclaim is in two counts. In the first count, defendant alleged "that on the — day of December, 1933, plaintiff borrowed of defendant, and defendant loaned to plaintiff, the sum of One Thousand Dollars, on the express agreement with said plaintiff that said loan was for the term of one year, with interest thereon from date at the rate of five per cent per annum, and that the same, both principal and interest, would be fully repaid to defendant on the — day of December, 1934; that pursuant to said agreement, defendant delivered to plaintiff and plaintiff accepted, under the terms of said agreement, and has since retained and still retains said sum of One Thousand Dollars, but has wholly failed and refused to pay the same, or any interest thereon," for which sum with interest, judgment was prayed.

For his second count, defendant alleged that on December —, 1933, plaintiff bank was not functioning as a banking institution, but was then taking steps for resuming banking operations, and that plaintiff bank represented to defendant that in connection with such arrangements it would be necessary for depositors of said bank to let their

funds remain on deposit with plaintiff for some time after the plaintiff resumed the operation of its banking business; "that plaintiff rep-' resented to defendant that one Lelia Francis then had on deposit with plaintiff the sum of Five Hundred Dollars, which she was unwilling to consent to remain in said bank and that she had refused to agree to leave in said bank according to said requirements; that plaintiff requested defendant, for the accommodation of plaintiff, to sign a note to said Lelia Francis for said sum of Five Hundred Dollars and make it appear that defendant borrowed said sum of Five Hundred Dollars from said Lelia Francis, said bank representing to defendant that the retention of said sum by it was necessary to enable it to re-open its said business, and plaintiff assuring defendant that if he, defendant, would so execute said note and leave the proceeds thereof, to-wit, the sum of Five Hundred Dollars, in said bank for its use and benefit, that plaintiff would pay said note and interest thereon and hold defendant harmless by reason thereof."

Defendant further alleged that pursuant to said request and representations of plaintiff, defendant signed a note dated December 27, 1933, payable to the order of said Lelia Francis, for the sum of $500.00, due one year after date, with interest thereon at the rate of seven percent per annum, and that the bank received and appropriated and retained all of the proceeds of said note; that although the bank, pursuant to its agreement, paid, on two separate occasions, the interest accrued on said note, it later failed and refused to make any further payments either of principal or interest, and that defendant was, on the first day of December, 1937, required by said Lelia Francis, the then owner and holder of said note, to pay same, the principal and interest then amounting to $563.49, which sum defendant paid in satisfaction of said note, and for which sum judgment was prayed.

Plaintiff's answer to said counterclaim consisted of a general denial, and the further allegation "that the only indebtedness of plaintiff to defendant consists of three certain non-negotiable promissory notes, each in the principal sum of Five Hundred ($500.00) Dollars, and described as 'Class B Capital Notes' of this plaintiff owned and held by defendant; that said notes are not due and payable and that plaintiff is not indebted to defendant except for said notes.'"

In support of the first count of his counterclaim, respondent testified to the facts as pleaded therein. He further testified that after turning over to the bank a $1000 bond, representing a $1000 loan, he made frequent demands on Mr. Boggess, the vice-president of the bank, to give him some evidence of the agreement on which this loan was made. He testified that finally Mr. Boggess told him that he would give him two $500.00 Class B notes, and that some three weeks after he had handed over the $1000 bond to the bank, he received through the mail two Class B notes, each in the principal amount of $500.00 These notes were dated January 9, 1934, and were not due until August 1,

1953. By their terms they were made subject to certain prior obligations of the bank, denominated as Class A notes which evidenced an indebtedness to a United States Government lending agency in the aggregate amount of $30,000.

Appellant bank offered in evidence a page from a stock book which disclosed respondent's signature indicating the receipt by him of the *two* Class B notes, which he testified had been received by him through the mail. Respondent admitted that he had retained these two notes. When asked if he accepted these notes as evidence of the bank's obligation, he answered, "Yes, sir. I had to do that or have nothing." Respondent, however, at all times denied that the provisions appearing in these two Class B notes represented the agreement on which he had made the loan to the bank.

As to the second count, respondent testified to all of the facts pleaded therein, and with reference to the allegation that the bank had twice paid the interest on the note, respondent testified that shortly before the note became due, one year after date, he appeared at the bank to ascertain whether the note was going to be paid, and that the vice-president of the bank told him that they were not going to pay the note at that time as the payee of the note did not need the money, and he then directed an employee of the bank give to respondent $35 covering the year's interest due thereon, and that said employee took the money from the *bank drawer* and handed it to respondent, and that he thereupon paid the interest; that again at the end of the second year, he went to the bank with respect to the payment of this note and was again handed $35 with which to pay that year's interest, and when the note became due the third year he again went to the bank and, on this occasion, the same officer of the bank refused to have anything more to do with it, declining to pay either principal or interest.

The testimony of Mr. Boggess, the vice-president of the bank, substantially corroborated the testimony as to the interest payments. He testified, however, that on one of the occasions he paid the interest out of his own pocket just to get rid of respondent, and on the second it it was paid out of the funds of the bank.

Plaintiff adduced evidence to the effect that beginning in October, there were discussions among the directors as to ways and means whereby the bank might carry on as a banking institution; that the necessity for raising additional money among the directors and friends of the bank in order to procure a loan from a government lending agency was discussed; and that the question of the bank's issuing and selling Class B notes was discussed, and that at one of these meetings the respondent orally agreed to subscribe for two of these notes, and later orally subscribed for a third. It is not contended that he at any time signed any written subscription therefor.

Thereafter, on January 9, the directors of the bank passed a resolution formally authorizing the issuance of Class B notes to mature in 1953, which should be subordinate to the above described Class A notes. There was evidence to the effect that respondent was present at some of these preliminary meetings where this incident of reorganization was discussed, and there was evidence that he was present at the meeting of January 9, at which meeting the Class B notes were authorized. Respondent denies positively that he was at the meeting of January 9, but admits that he talked with some of the directors about plans for opening the bank and borrowing government money and by raising some money locally.

Testimony on behalf of appellant further disclosed that a third Class B note for $500 was with respondent's note to Mrs. Francis, apparently as collateral security, and that this note bore the endorsement of respondent. Appellant also offered in evidence a check of Mrs. Francis' to the order of respondent, in the sum of $500, which check was endorsed by respondent.

The testimony is undisputed that respondent's note payable to Mrs. Francis was made out at the bank and was executed at the bank. Respondent denied that he then had, or had ever had, possession of the third Class B note, but admitted his signature thereon. He likewise admitted his endorsement of Mrs. Francis, check which was made payable to his order, but denied that he had received any of the proceeds thereof.

Upon trial of the case, and at the conclusion of the evidence, appellant requested a directed verdict on each count of the counterclaim. The requests were denied. The jury returned a verdict in favor of defendant on both counts of the counterclaim in the aggregate sum of $1750.73, whereupon judgment was rendered in favor of the respondent against the appellant in the sum of $458.50, being the excess of the amount allowed respondent over that allowed appellant.

It is well recognized that as a general rule, an appellate court, in passing upon a demurrer to the evidence in an action at law, must give to the successful party in the lower court the benefit of all evidence most favorable to him, together with the most favorable inferences that may reasonably be drawn therefrom, and where the evidence of the opposing party is in conflict therewith, it must be disregarded. [Francis v. Missouri Pacific Transportation Co., 85 S. W. (2d) 915, l. c. 917, and cases there cited.]

Appellant concedes this to be the general rule, but contends that this rule is subject to equally well recognized exceptions, and that where the finding of the jury is contrary to undisputed evidence, or the testimony on which such verdict is based is so improbable as not to be worthy of belief or is contrary to physical facts, then it becomes the duty of the appellate court to reverse a judgment predicated on such a verdict.

It is undoubtedly true that if an element of proof essential to recovery is predicated solely on testimony that is contrary to physical facts, no case is made and, under such circumstances, it is the duty of an appellate court, upon so finding from an examination of the evidence, to reverse a judgment based upon testimony that is impossible of belief. And, likewise, when a *prima facie* case is squarely met with undisputed documentary evidence, an appellate court may reverse a judgment so out of harmony with the facts so established. [Yarber v. Connecticut Fire Ins. Co., 10 S. W. (2d) 957, l. c. 958, 960; Kazee v. K. C. Life Ins. Co. (Mo. App.), 217 S. W. 339, l. c. 342; Ducoulombier v. Thompson, 124 S. W. (2d) 1105.]

In Darlington Lumber Co. v. Missouri Pacific Rd. Co., 243 Mo. 224, l. c. 245, the Supreme Court said:

"If the evidence in rebuttal is in writing, or a matter of record, and stands undisputed, and it completely overcomes and destroys the *prima facie* case made, then it is perfectly proper for the court to declare the legal effect of said writing or record, by declaring, as a matter of law, that the plaintiff is not entitled to a recovery, notwithstanding the *prima facie* case previously made by the evidence. This is elementary and the citation of authorities in support thereof is unnecessary."

We think it clear, however, that the record in this case, as to both the first and second counts of the counterclaim, does not warrant the invocation of this rule. As to the first count, respondent testified to an agreement with an officer of the bank, whereby he was to turn over to the bank for its use a $1000 government bond, and in consideration therefor the bank was to pay him $1000 one year thereafter, together with interest at the rate of five per cent per annum. This agreement was made in December, 1933. After this agreement, and on January 9, 1934, the directors of the bank passed a resolution authorizing the issuance by the bank of its Class B notes, payable in 1953, which notes should be subordinate to its Class A notes issued in conformity with the terms of a loan from an agency of the United States government.

Defendant testified that following the date he turned over to the bank this bond, he persistently demanded some evidence of the agreement had between the parties with respect thereto, and that some three weeks after the original transaction, an officer of the bank sent him by mail two Class B notes which had not been formally authorized until some two or three weeks after respondent's alleged agreement with the bank had been entered into. He admitted that he had heard some discussion about borrowing some government money and raising some money among the directors and friends of the bank, but denied that he knew anything of the terms and conditions to be incorporated in any obligations of the bank that might thereafter be issued. While an officer and attorney of the bank testified that respondent had subscribed first for a $1000 loan, and second for an additional $500 loan to the

bank, that he had made a private memorandum of the subscription at the time which he had retained in his private office, the respondent denied that he had ever agreed to make any subscription to the bank or to lend it any money on any terms other than those to which he testified.

A different situation might be presented had appellant produced in evidence a subscription for a loan and the terms therein set out, to which respondent's signature was appended. But no such documentary evidence was produced and the testimony was to the effect that there was none. The fact that respondent received and retained the two Class B notes and signed a paper apparently acknowledging receipt thereof, undoubtedly lends some support to appellant's version of the transaction. We might say in passing that had the jury's verdict been in favor of the appellant on either or both of these counts, the evidence offered by appellant was sufficient to have sustained such a verdict. But it cannot be said that the undisputed documentary evidence in this case was such as to completely destroy the case made by the testimony offered on behalf of respondent.

As to count two, we think this is even more apparent. With respect to the circumstances of his signed note payable to Mrs. Francis, respondent stated that he did not know her and had never seen her at the time he signed the note.

"Q. How did you happen to execute that note to her, Mr. Thompson? A. Well, Mr. Boggess told me that she had $500.00 in the bank and that he wanted to keep the money in the bank, and that she wouldn't have any use for it and the only way that he could do that was to get someone to sign the note, and he asked me several times before I would sign the note, and he told me that the bank would take care of the note."

Respondent had nothing to do with the preparation of the note. It was prepared at the bank and, according to his testimony, he signed the note at the bank at the request of an officer of the bank. Although it appears that he endorsed a check of Mrs. Francis' payable to his order, he testified that he never received a cent of the proceeds thereof, but merely endorsed it and turned it over to the bank. There is no evidence that he directly received any of the money or that any of said money was placed to his credit in the bank. The fact that he endorsed the check does not necessarily contradict respondent's version of this transaction. On the other hand, it seems this is what he would have to do in order to carry out the purpose of the argument, to-wit, to furnish the bank with the money on deposit to the credit of Mrs. Francis.

As to his endorsement of the Class B note, which apparently the bank delivered to Mrs. Francis along with respondent's note, we think it may reasonably be inferred from the testimony that this was the bank's own idea of supporting respondent's note with the bank's obligation as collateral security. While admitting his signature, re-

spondent testified he had no recollection of having seen or endorsed this Class B note. It is not inconceivable that the testimony of respondent in this regard may be true. At the time he was called in to sign the note, all the terms of the arrangement having been theretofore agreed upon, his endorsing the Class B note may at the time have been considered by him, (if considered at all) as an inconsequential incident in carrying out the proposed plan. He testified that as a director of the bank, he had been called upon to sign papers frequently, which he had often done without reading them, relying solely upon representations made thereto by officers of the bank.

It is our conclusion, therefore, that the documentary evidence here offered on behalf of appellant was insufficient as a matter of law to destroy the testimony offered on behalf of respondent in support of his counterclaim, which, standing alone, made out a case on each count thereof.

Appellant also urges error in the refusal by the trial court to grant a new trial because of perjury committed by defendant, resulting in an improper verdict, citing section 1002, Revised Statutes of Missouri, 1929. This section governs the action of the *trial* court in granting a new trial. It there provides that a new trial shall be granted "when the court is satisfied that perjury or mistake has been committed by a witness, and is also satisfied that an improper verdict or finding was occasioned by any such matters. . . ."

In this case, the court gave at the request of appellant an instruction on credibility of witnesses which directed the jury that if they found from consideration of all the evidence "that any witness has wilfully sworn falsely to any material fact in issue, then you are at liberty to disregard the whole or any part of such witness' testimony."

One of the grounds for new trial was plaintiff's alleged perjury. This matter was thus called to the trial court's attention, and the trial court was thus under a duty to consider and determine whether or not an improper verdict had been reached, based upon perjured testimony. The determination of such a question is left to the sound discretion of the trial court, and it is only in cases in which the evidence clearly discloses that the trial court has abused its discretion that an appellate court is warranted in interfering with the judgment on this ground.

Appellant cites Seymour v. Tobin Quarries, 123 S. W. (2d) 628. This court there said:

"In passing upon new trial the trial court may grant same on his conclusion that material evidence is false based upon his observation of the witness. Before appellate courts give such consideration the printed record must clearly show perjury."

And, in Gavin v. Forrest (Mo. App.), 72 S. W. (2d) 177, it was there held:

"All these matters were unquestionably in the mind of the trial judge when he came to consider defendant's motion for new trial, wherein defendants set forth in full their contention charging that the witness had been guilty of fraud, deceit, and perjury to the surprise of defendants and their attorneys. . . .

"The granting or refusing of a new trial on the ground of alleged perjury of a witness is a matter which the law leaves to the sound discretion of the trial judge. The very language of the statute, set forth above, clothes the trial judge with a wide discretion which is to be exercised by him in favor of granting a new trial when he 'is satisfied that perjury or mistake has been committed by a witness, and is also satisfied that an improper verdict of finding was occasioned by any such matters.' "

The record in this case does not warrant our holding that the trial court abused its discretion in ruling adversely to plaintiff on this ground for new trial.

Appellant urges that the trial court erred in failing to grant plaintiff's application for a separate trial on plaintiff's counterclaim, but cites no authority in support of this position. Section 951, Revised Statutes of Missouri, 1929, provides that the court may, on application of either party, direct separate trials where there are several causes of action united in a petition or where there are several issues involved. The undoubted purpose of this statute is to permit the trial court to grant separate trials on the several issues in a case where confusion would result if the trial of all such issues were in a single trial. The granting of separate trials rests within the discretion of the trial court, and will not be interfered with unless it appears that the court has abused its discretion. [Smith v. Baer, 166 Mo. 392; Stone v. Perkins, 217 Mo. 586, l. c. 606.] No confusion of issues contemplated by this section of the statute could have resulted from the refusal of the trial court to grant separate trials on plaintiff's cause of action and upon the causes of action set up by defendant in his counterclaim respectively. In the actual trial of the case, there was no defense made to plaintiff's cause of action on defendant's promissory note, and on this phase of the case, the jury was directed to return a verdict in plaintiff's favor. The only issues submitted to the jury for its determination were those relating to defendant's counterclaim. The trial court's ruling in this respect was not erroneous.

Appellant makes the further contention that respondent accepted and retained the aforedescribed Class B notes, and that such acceptance and retention by respondent precludes any recovery on his counterclaim.

As to the third Class B note mentioned in the second count of the counterclaim, this contention cannot prevail. Considering the testimony in the light most favorable to respondent, it would appear that respondent never actually had possession of this note other than for the

purpose of endorsing it as one step in a plan proposed by appellant for acquiring the use of the $500 on deposit in appellant's bank in the name of Mrs. Francis. Hence this point as to the second count of the counterclaim must be ruled against appellant.

In January, 1934, respondent did, however, receive in the mail from appellant bank two Class B notes for $500 each. He testified that upon his insistence that the bank give him some evidence of his alleged loan to the bank, that Mr. Boggess, the vice-president of the bank, agreed to give him these two Class B notes. He testified that he did not know the terms and conditions of these notes at the time of his conversation with Mr. Boggess, nor until he received them in the mail. This leaves a clear inference that upon receipt of these notes he did examine them and advise. himself as to their contents. He then retained said two notes continuously from the time of the receipt thereof up to the time of trial, which was a. period of more than four years. It will also be remembered that some time after receipt of these two notes and his acquaintance with the terms thereof, the exact date not appearing, respondent signed a page in the stock book of the bank acknowledging receipt of said two notes.

There is no dispute that the $1000 named in the first count of the counterclaim and the $500 named in the second count of the counterclaim represented the only indebtedness of the bank to the respondent, and respondent's only explanation for retaining the two notes was that they represented the only evidence he could get as to the loan of $1000 which he had made to the bank.

It seems to be well-settled that where a note is given by a debtor to a creditor for a pre-existing debt, and the note is retained by the creditor, it will have the effect of postponing the creditor's right of action until the date of the maturity of the note. [1 C. J. S., p. 1389, para. 124 (g).]

In Barton Lumber Co. v. Gibson, 178 Mo. App. 699, l. c. 707, the court there said:

". . . it is quite clear that when the note bearing date September 21, 1910, was accepted by plaintiff on September 24, 1910, it operated to suspend the right to sue upon the indebtedness for the time which the note had to run, to-wit, sixty days from its date. Hence plaintiff had no cause of action against the defendant on September 27, 1910, when it instituted this action. It is not disputed that defendant was then and is now indebted to plaintiff in the sum for which the action is prosecuted. However, it is quite clear that defendant was entitled not to be sued thereon until the maturity of the note, at which time he might have paid the same without suit and the costs attending the same." [See, also, Morton Electric Co. v. Schramm (Mo. App.), 277 S. W. 368, l. c. 371, and cases there cited. Also, Big Four Implement Co. v. Chesney, 204 Mo. App. 285, l. c. 286; Missouri State Highway Board v. Southern Surety Co., 9 S. W. (2d) 92, l. c. 95.]

460

The retention of these two notes by respondent for a period of more than four years, under the circumstances herein recited, presents a situation in which the above rule is clearly applicable. We deem it that, as a matter of law, the retention of these notes for a period of more than four years was a retention beyond any reasonable time within which their return might avoid the effects of this rule. Thus, respondent's conduct amounted to an acceptance of the notes as evidence of the debt.

We are, therefore constrained to hold, under the circumstances herein set out, that the cause of action set up in the first count of respondent's counterclaim was prematurely brought and, to that extent, the judgment cannot stand.

It follows that the judgment must be reversed and the cause remanded with directions to the trial court to set aside the judgment heretofore entered herein, and to enter a new judgment in harmony with the views herein expressed. All concur.