

# SUPREME COURT OF MISSOURI
## en banc

PHILLIP H. MARCH,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀Respondent,⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀No.  SC92984
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
MIDWEST ST. LOUIS, L.L.C.,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀Appellant.⠀⠀⠀)

### APPEAL FROM THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
The Honorable Edward W. Sweeney, Jr., Judge

*Opinion issued January 14, 2014*

Midwest St. Louis, L.L.C., appeals the trial court's order granting Philip H. March a new trial after a jury verdict in favor of Midwest.  The trial court granted a new trial because it found that a key witness for Midwest, Louis L. Akin, deliberately testified falsely about a material issue at trial that likely resulted in an improper verdict and that, alternatively, newly discovered evidence merited a new trial.  Midwest asserts that all of Mr. Akin's testimony was true and that, if there was false testimony, it was not material to the jury's verdict.  Furthermore, Midwest claims that the evidence presented does not qualify as newly discovered evidence that merits a new trial.  Because Midwest does not meet its burden of clearly demonstrating that the trial court abused its discretion in finding that Mr. Akin falsely testified and an improper verdict resulted therefrom, this Court affirms the trial court's judgment.

**Factual and Procedural Background**

The underlying case is a civil claim of premises liability, arising from a stabbing that occurred at approximately 2 a.m. April 24, 2007. The stabbing occurred on or near the property of a gas station and convenience store owned and operated by Midwest. Prior to the stabbing, there had been fifteen police reports of prior crimes on the property, and employees of the convenience store had been caught trying to sell illegal weapons to undercover FBI informants. Midwest had promised city officials that it would hire off-duty police to patrol the property, but it failed to do so.

Phillip H. March was the victim of the assault, and no one witnessed the incident. On the evening of the assault, Mr. March had been at a bar with his brother. After leaving the bar in the early morning hours, the brother began driving the two of them home and stopped for snacks at Midwest's convenience store on their way. After the two made their purchases, Mr. March decided he was not ready to go and told his brother to leave him at the store. After calling friends from the store's outdoor payphone, Mr. March walked across the front of the store to a dumpster on the east side of the building to urinate. He claims that the assailant approached him at this time.

Mr. March was intoxicated at the time of the assault and had no recollection of the incident immediately after it occurred due to extensive injuries that nearly caused his death. However, he later stated, and currently contends, that the assault occurred next to a dumpster located on Midwest's property. Midwest disputes the location of the assault, claiming it occurred in an alley behind Midwest's property, thereby negating any liability for the assault.

Several police officers responded to the incident and gathered evidence at the scene of the crime. At trial, the responding officers offered contradictory testimony as to where they spotted blood, either in the alley or near the dumpster. Detective Tonya Tanksley said that her investigation revealed a single trail of blood that she followed into the alley behind the store, where she found a pool of blood. She said that she did not recall seeing blood near the dumpster. Officer George Weindel also responded to the scene. He said he examined a pool of blood at the entrance of the convenience store and then followed a blood trail around the building to the alley. He did not remember having looked by the dumpster for blood; however, he saw nothing in his investigation that would rule out Mr. March's recollection that he was stabbed by the dumpster. Finally, Sergeant Thomas Majda testified that he remembered seeing blood by the dumpster and in the grass near the dumpster. He testified that one other officer saw "some blood on a fence or something near the dumpster" and then tracked it to the alley to a small pool of blood. The only other testimony concerning the location of the stabbing was provided by experts retained by each of the parties.

Mr. March's expert was Iris Dalley, a blood spatter analyst, who testified that there was not enough information to provide an expert opinion as to where the stabbing occurred. Conversely, Midwest's expert crime scene analyst, Louis L. Akin, testified that the stabbing occurred in the alley behind the gas station and not on the property owned by Midwest. Mr. Akin based his opinion on the results of the police investigation and photographs of the scene taken by the investigating officers.

During direct examination, prior to providing his opinion about the location of the stabbing, Mr. Akin testified about his education, training, and relevant experience that qualified him as an expert witness. When asked whether he was "currently involved in any major investigation where [he had] been retained by the U.S. Government," he responded by stating, "I recently just finished reconstructing the Fort Hood shooting by Major Malik Hasan." This testimony became the basis of the trial court's grant of a new trial.

The trial concluded with the jury returning a verdict for Midwest. Mr. March then filed a motion for a new trial, alleging that Mr. Akin committed perjury by falsely testifying about his credentials as an expert witness. Mr. March based his allegation on evidence he claims to have discovered after trial. This evidence consisted of a post on Mr. Akin's website, which was removed from his site shortly after he was retained by Midwest. The post, written by Mr. Akin, stated that he had recently been retained as an expert on behalf of the *defense* in the Fort Hood shootings case, not as an expert on behalf of the prosecution.

Following a hearing, the trial court sustained Mr. March's motion for a new trial in a 12-page judgment, finding that Mr. Akin's response indicating that he was retained by the United States government, rather than by Major Hasan's defense counsel, was perjury. The court, alternatively, found that Mr. March was entitled to a new trial on the ground that the evidence indicating Mr. Akin was retained by Major Hasan's defense team was newly discovered. Midwest appealed. Following an opinion by the court of appeals, this Court granted transfer. Mo. Const. art. V, sec. 10.

4

On appeal, Midwest asserts that the trial court erred in granting Mr. March's motion for a new trial because Mr. Akin did not commit perjury and the evidence allegedly discovered following the trial did not amount to new evidence.

**Standard of Review**

A trial court's decision to grant a new trial under Rule 78.01 is reviewed for abuse of discretion, including when the trial court grants a new trial after determining that perjury occurred and that an improper verdict resulted therefrom. *Hancock v. Shook*, 100 S.W.3d 786, 801 (Mo. banc 2003); *Nance v. Kimbrow*, 476 S.W.2d 560, 561 (Mo. 1972). An appellate court only will interfere in a trial court's decision to grant a new trial based on perjury when the evidence clearly demonstrates that the trial court has abused its discretion. *Hancock*, 100 S.W.3d at 801.

A trial court abuses its discretion when its "ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* at 795 (quoting *Nelson v. Waxman,* 9 S.W.3d 601, 604 (Mo banc. 2000)). "If reasonable persons can differ as to the propriety of the trial court's actions, then it cannot be said that the trial court abused its discretion." *Id.*; *see also Donati v. Gualdoni*, 216 S.W.2d 519, 522 (Mo. 1949). It is the appellant's burden to prove that the trial court abused its discretion by granting a new trial on the stated grounds. *Precision Elec., Inc. v. Ex-Amish Specialties, Inc.*, 400 S.W.3d 802, 808 (Mo. App. 2013). In reviewing a circuit court's ruling resulting in either the grant or denial of a new trial, appellate courts view

the evidence in the light most favorable to the circuit court's order. *Badahman v. Catering St. Louis,* 395 S.W.3d 29, 39 (Mo. banc 2013).

## False Testimony

After a hearing on Mr. March's motion for a new trial, the trial court determined that Mr. Akin willfully and deliberately had provided false testimony, that this testimony regarded a material matter and likely occasioned an improper verdict, and that a new trial was required as a result. Granting a new trial on the ground of perjury requires more than "a mere mistake in testimony." *A.M.S. ex rel. M.E.S v. J.L.B.*, 723 S.W.2d 891, 892 (Mo. App. 1985) (quoting *Humfeld v. Langkop*, 591 S.W.2d 251, 254 (Mo. App. 1979)) (internal quotations omitted). As found by the trial court, "the granting of a new trial on perjury grounds requires a showing that the witness willfully and deliberately testified falsely." *Hancock*, 100 S.W.3d at 801. Because a reviewing court does not have the luxury of observing the witness, hearing the inflection in witness' voices, their manner of answering questions, and the pauses they might take in responding, this Court defers to the trial court's factual findings and determinations concerning witness credibility. *Donati*, 216 S.W.2d at 522; *Lee v. Rudolph-Brady,* 236 S.W.3d 658, 659 (Mo. App. 2007). The significant deference given to the trial court is evidenced by the more than thirty reported Missouri decisions that have reviewed a trial court's grant or denial of a new trial based on perjury grounds.[1] In only two of those decisions did a reviewing court

---

[1]*Hancock v. Shook,* 100 S.W.3d at 604*; Loveless v. Locke Distributing Co.*, 313 S.W.2d 24, 31-33 (Mo. 1958); *Donati*, 216 S.W.2d at 521-22; *Pitzman's Co. of Surveyors & Engineers v. Bixby & Smith, Inc.*, 93 S.W.2d 920, 921-22 (Mo. 1936); *Neal v. Kansas City Rys. Co.*, 229 S.W. 215, 219 (Mo. 1921); *Sly v. Union Depot Ry. Co.*, 36 S.W. 235,

6

reverse a trial court's grant of a new trial because it found the trial court abused its discretion in ruling on the merits of a claim of perjured testimony. In *Loveless v. Locke Distributing Co.*, this Court reversed the trial court's ruling because the allegedly false testimony was prior inconsistent estimations of distance and the position of an automobile and the prior inconsistent statements actually were offered at trial for impeachment purposes so that the "jury had as much opportunity as another would have to evaluate it." 313 S.W.2d 24, 31-33 (Mo. 1958). In *M.E.S. v. Daughters of Charity Serv. of St. Louis*, the court of appeals ruled that the trial court abused its discretion in not granting a new trial when a key defense witness admitted perjured testimony on a relevant issue.[2] 975 S.W.2d, 481-83 (Mo. App. 1998).

---

238 (Mo. 1896); *Lee v. Rudolph-Brady*, 236 S.W.3d at 659; *Butts v. Express Personal Servs.*, 73 S.W.3d 825, 842 (Mo. App. 2002); *Bailey v. Cameron Mut. Ins. Co.*, 122 S.W.3d 599, 604-05 (Mo. App. 2003); *Atlas Corp. v. Mardi Gras Corp.*, 962 S.W.2d 927, 930 (Mo. App. 1998); *Hoodco of Poplar Bluff, Inc. v Bosoluke*, 9 S.W.3d 701, 704-05 (Mo. App. 1998); *M.E.S. v. Daughters of Charity Servs. of St. Louis*, 975 S.W.2d 477, 482-83 (Mo. App. 1998); *Gilliam v. Chicago & Northwestern Transp. Co.,* 859 S.W.2d 155, 160-61 (Mo. App. 1993); *In re Marriage of Clark,* 813 S.W.2d 123, 126 (Mo. App. 1991); *Humfeld v. Langkop,* 591 S.W.2d 251, *Chastain v. Chastain*, 632 S.W.2d 291, 293 (Mo. App. 1982); (Mo. App. 1979); *A.M.S.,* 723 S.W.2d at 892; *Calvin v. Lane*, 297 S.W.2d 572 (Mo. App. 1957); *Carson v. Hagist*, 143 S.W.2d 355 (Mo. App. 1940); *DeMoss v. Baudo*, 79 S.W.2d 766, 769-70 (Mo. App. 1935); *Buehler v. Baum*, 71 S.W.2d 851, 853-54 (Mo. App. 1934); *Gavin v. Forrest,* 72 S.W.2d 177 (Mo. App. 1934); *Brand v. Herdt*, 45 S.W.2d 878 (Mo. App. 1932); *Davis v. Querman,* 22 S.W.2d 58 (Mo. App. 1929); *Thompson v. B. Nugent & Bro. Dry Goods Co.*, 17 S.W.2d 596, 597 (Mo. App. 1929); *Asadorian v. Sayman*, 282 S.W. 507 (Mo. App. 1926); *Wright v. Hines*, 235 S.W. 831 (Mo. App. 1921); *Callison v. Eads*, 211 S.W. 715 (Mo. App. 1919); *Scott v. St. Joseph Ry.,* 153 S.W. 1058 (Mo. App. 1913); *Ridge v. Johnson*, 107 S.W. 1103, 1103-04 (Mo. App. 1908); *Rickroad v. Martin*, 43 Mo. App. 597, 603 (1891).

[2] In two additional cases, a reviewing court reversed the trial court's ruling on a motion for new trial for perjured testimony on legal or procedural grounds. *See A.M.S.,* 723 S.W.2d at 892 (court of appeals reversed the trial court's grant of a new trial because it found "mistakes" in testimony rather than deliberate, willful false testimony); *In re*

In this case, the testimony providing the trial court's basis for its grant of a new trial pertains to Mr. Akin's testimony regarding his credentials as a crime scene reconstructionist. The following testimony occurred near the beginning of the direct examination of Mr. Akin by Midwest's counsel:

> Q:      Now, can you give – just to give the jury an example of who you work for and what you do, are you currently involved in any major investigation where you've been retained by the U.S. Government?
> A:      I recently just finished reconstructing the Fort Hood shooting by Major Malik Hasan.
> Q:      And that was the massacre in Texas that we've all read about?
> A:      The massive killing at the – at Fort Hood.
> Q:      And what was your –
> A:      On base.
> Q:      What was your function in that regard?
> A:      Blood spatter and crime scene reconstruction.

Midwest contends that Mr. Akin did not provide false testimony when he stated that he had "just finished reconstructing the Fort Hood shooting" in response to the inquiry by its counsel as to his current involvement in a major investigation where he was "retained by the U.S. Government." According to Midwest, because Mr. Akin was not specifically asked the nature of his involvement in the investigation, his failure to clarify that he was retained as an expert for the defense cannot amount to perjury. Furthermore, Midwest argues that because he was retained by the III Corps and Fort Hood, a subsidiary of the United States government, for the United States Army Trial Defense Service and

---

*Marriage of Clark,* 813 S.W.2d at 126 (court of appeals reversed trial court's denial of a new trial because the trial court erroneously ruled the claim was procedurally barred).

paid with United States government funds, Mr. Akin's statement was not technically false, even in the context of the question posed.

Statements are "false" when they are "not true." *Webster's Third New Int'l Dictionary* 819 (1993). Among the dictionary definitions included for the word "true" are: "conformable to fact; in accordance with the actual state of affairs" and "void of deceit . . . not sham, counterfeit, or adulterated." *Id.* at 2454

Mr. Akin's reply to Midwest's counsel indicating that he was retained by the United States government to investigate the Fort Hood shooting cannot be accepted as "in accordance with the actual state of affairs." Even though federal government funds ultimately were used to pay for Mr. Akin's services, his response to a forthright question was inaccurate and not "void of deceit." Mr. Akins was a senior investigator and training officer in the Texas attorney general's office for four years. It reasonably can be inferred that, in that work, he gained knowledge of the meaning of the word "retained" in the context of the government. The way Midwest now alleges Mr. Akin employed the word "retained" is akin to saying that an individual, hired by the Missouri State Public Defender's office as an expert for the defense, is retained by the state of Missouri, when "the state" is universally identified as the prosecution in criminal proceedings.

For this reason, the trial court found that Mr. Akin's response gave the court and the jury "the distinct idea that [Mr.] Akin was working for the United States government in connection with the prosecution of Major Hasan." The trial court concluded:

> The testimony was false because witness Akin does <u>not</u> work for the U.S. Government in connection with the investigation of the Fort Hood killings (nor in connection with any other case – at least there was no evidence

9

presented that Akin is or has been working for the U.S. Government in connection with any other case). Akin was <u>not</u> retained by the U.S. Government to do blood spatter and crime scene reconstruction of the Fort Hood shooting; Atkin was retained by the attorneys appointed to represent the person accused of those shootings, Major Malik Hasan.

\* \* \*

[I]t strains credulity past the breaking point to suggest that when [Mr.] Akin heard the question at trial whether he was retained by the U.S. Government, he thought he was being truthful by giving his answer without any clarification that he was working for the defense of Major Hasan, and not on behalf of the U.S. Government.

\* \* \*

Before testimony is given, every witness in every case must swear or affirm "to tell the truth, the whole truth, and nothing but the truth." It is a cynical day and age, and many concepts of honor and integrity seem to have evaporated like the mist at dawn. This Court believes, however, that there is a difference between truth and falsehood. In this case, this Court has no doubt that witness Akin knew at the time he was asked the question by defense counsel who he was working for and if he was currently involved in any major investigation where he had been retained by the U.S. Government that when he gave his answer he was prevaricating, he was deviating from the truth; he was deceiving the Court and the jury.

These findings are supported by the record. Under the plain and ordinary meaning of the word "retained," Mr. Akin's response was untruthful, and the motion court did not err in finding that he testified falsely.

The motion court also found that Mr. Akin's false testimony was given willfully and deliberately. The court made this determination based on a series of facts, including: a website post, made by Mr. Akin on or around January 15, 2010, stating that he was hired on behalf of the defense in the Fort Hood shootings case;[3] Mr. Akin's removal of

---

[3] The entirety of Mr. Akin's website posting stated:

the January 15, 2010, post from his website shortly after its posting and before his deposition; and the fact that Mr. Akin's involvement in the Fort Hood case never was mentioned during his February 16, 2010 deposition. These details led the trial court to conclude that Mr. Akin was aware of his role in the Fort Hood shooting case, who had hired him, who he was working for, and his failure to provide a response that accurately conveyed that information was a deliberative prevarication.

Under the standard that the trial court's determination should be reviewed for an abuse of discretion, *Hancock*, 100 S.W.3d at 801, the evidence does not clearly demonstrate that the trial court abused its discretion in finding that Mr. Akin willfully and deliberately testified falsely.

---

Major Nidal Malik Hasan, now thirty-nine years old, born and raised in Virginia, is, like so many Americans, the son of immigrant parents. He is a religious man, a Muslim, just as some Americans are religious Catholics, Protestants, Jews, Buddhist, or Hindus. He was a soldier, an officer, a doctor, and a member of the United States Army when the shootings at Fort Hood occurred. Now he lies paralyzed in a military hospital. He will be tried for the events of that fateful November day. Although some in the media have thrown any façade of objectivity out the window in their reporting on him, and although some politicians continue to make as much political capital as they can by ranting about him, he has not yet been tried in a court of law. He has not yet been found guilty under the laws of our land. It is not only that Hasan deserves a trial; it is that we, as Americans, as a just conscientious people, deserve to hear the evidence against him. As Americans we stand for justice and fairness and the courage of our convictions if we stand for nothing else. Let us now test our courage, our convictions, our Americanism. Let us proceed in an orderly way according to our rule of law to have a trial. I have been chosen *as a defense expert* and I vow that I will use all of my experience and expertise to see that the facts presented by the prosecution at the trial of Major Hasan are true and accurate. That is as American as I can be.

(Emphasis added).

Even when a witness has provided false testimony, a trial court may grant a new trial only when it is satisfied that the perjury was material in character as to render an improper verdict. *Hancock,* 100 S.W.3d at 801 (citing *Hoodco,* 9 S.W.3d at 704. "'[T]he determination of the materiality of alleged false testimony is a question of law for the determination of the court.'" *Hancock*, 100 S.W.3d at 801 (quoting *Loveless v. Locke Distrib. Co.*, 313 S.W.2d 24, 31 (Mo. 1958)). Questions of law are reviewed de novo. *Triarch Indus., Inc. v. Crabtree*, 158 S.W.3d 772, 774 (Mo. banc 2012).

Midwest asserts that even if Mr. Akin's allegedly perjured testimony was false, it was not material to the verdict because it did not pertain to his opinion concerning the key issue of whether the incident occurred on Midwest's property. Furthermore, Midwest contends that Mr. Akin's allegedly perjured testimony was immaterial because his other credentials — that he was a certified medicolegal death investigator, had more than 3,000 hours of training in crime scene reconstruction, worked as an investigator for the Texas attorney general and had given presentations about blood spatter analysis — were alone sufficient to prove his authority as an expert.

In finding that Mr. Akin's perjured testimony was material, the trial court referenced the definition of "material fact" in section 575.040, RSMo 2000. Subsection 2 of section 575.040 states, for purposes of the crime of perjury, that "[a] fact is material, regardless of its admissibility under the rules of evidence, if it could substantially affect, or did substantially affect, the course or outcome of the cause, matter or proceeding." This Court has not used the "substantially affect" language from the criminal statute when reviewing the impact, or materiality, of the perjured testimony on the outcome of

the trial. Instead, it has merely required that "an improper verdict [has] resulted" from the perjured testimony. *Hancock*, 100 S.W.3d at 801.[4]  Prior cases cited statutory language and language from this Court's rule that authorized a new trial for perjured testimony when the trial court is "satisfied that an improper verdict or finding was occasioned" by the perjured testimony. *Donati*, 216 S.W.2d at 521 (citing section 1169 RSMo (1939) and Rule 3.22); *Pitzman's Co. of Surveyors and Engineers*, 93 S.W.2d at 921-22 (citing Section 1002, R.S. 1929); *Neal*, 229 S.W. at 218 (citing section 1453, R. S. 1919); Sly, 36 S.W. at 236-37 (citing Section 2240, Rev. St. 1889).

There is currently no statute expressly authorizing the grant of a new trial for perjured testimony. Rather, the current criminal and civil Supreme Court rules authorize the trial court to grant a new trial for "good cause shown" and the Comments to the applicable civil and criminal rules state that the revision of the rules was not intended "to eliminate any of the reasons for which new trials heretofore have been granted or to change the law concerning the grounds for granting a new trial. The revision has been made solely to make the Rule more concise." Rule 29.11; Rule 78.01. Therefore, this Court reviews the trial court's grant of a new trial for an abuse of discretion under the standard that the trial court must be "satisfied that an improper verdict or finding was occasioned" by the perjured testimony. Inherent in that standard is the requirement that

---

[4] In its analysis in *Hancock*, the Court cited *Loveless*, 313 S.W.2d at 32, with a quote in a parenthetical, which stated, "And courts are, and should be, reluctant to order a new trial . . . unless the after-trial facts . . . are of *such decisive and conclusive* character as to render a different result reasonably certain." *Hancock* , 100 S.W.3d at 801. The Court expressly stated that the "reasonably certain" standard in *Loveless* applied to the situation

13

the perjured testimony must be material to the improper verdict. *See Hancock*, 100 S.W.3d at 801; *Loveless,* 313 S.W.2d at 31; *Donati,* 216 S.W.2d at 521; and *Neal*, 229 S.W. at 219.

Missouri courts have not had many opportunities to examine the materiality of an expert witness's false testimony regarding his qualifications or its effect on the outcome of a case. However, other jurisdictions have determined whether false testimony concerning a credential or experience is material by assessing the impact of the false evidence of credentials in light of the other evidence and circumstances in the case. In some cases, the courts have concluded that, even though an expert witness lied about the witness's credentials, the false testimony did not result in an improper verdict because there was other overwhelming evidence of guilt or the jury heard ample evidence regarding the witness's credibility. *See, e.g.*, *Stevenson v. State*, 473 A.2d 450, 451, 453 (Md. 1984); *Howard v. State*, 945 So.2d 326, 370-71 (Miss. 2006); *People v. Irvin*, 180 A.D.2d 753, 753-54 (N.Y. Sup. Ct. App. Div. 1992). In other cases, however, the courts have found that the false evidence of a witness's credentials was material. *See, e.g.*, *State v. DeFronzo*, 394 N.E.2d 1027, 1031 (Ohio Ct. Com. Pl. 1978) (holding that a witness's perjury as to his qualifications called into question his authority as an expert and also the credibility of his entire testimony); *State v. Plude*, 750 N.W.2d 42, 53-54 (Wisc. 2008) (finding that an expert's lie about a credential may have affected the reliability of his essential testimony); *United States v. Wallach,* 935 F.2d 444, 447 (2d Cir. 1991)

---

where no "additional or different evidence could be adduced at another trial." *Loveless*, 313 S.W.2d at 32. That is not the case here.

14

(concluding that the witness's false statements concerning his gambling habits required a new trial because the witness was the "centerpiece of the government's case" who "tied all the pieces together").

In the case at bar, Mr. Akin's testimony concerning his qualifications and credentials was material to the outcome of the case because the credibility of his expert opinion alone was crucial to proving the essential inquiry in the case—whether the assault occurred near a dumpster on Midwest's property or in an alley outside of Midwest's property. While three law enforcement officers who visited the scene provided testimony about where they found blood, the testimony was conflicting. Detective Tonya Tanksley testified that she was certain that no blood was present near the dumpster and that, in her opinion, the assault occurred in the alley. Officer George Weindel, who took photographs to preserve the evidence, did not recall looking by the dumpster for blood and testified that, in his experience, nothing in the crime scene photographs ruled out the possibility that the assault occurred near the dumpster. Finally, Sergeant Thomas Majda, on direct examination, testified that he remembered seeing blood by the dumpster and in the grass nearby that tracked back into the alley. However, after being told that Officer Weindel had not taken any pictures of the dumpster, Sergeant Majda equivocated, saying there "probably" was not any blood by the dumpster.

Along with the testimony of the police officers, two expert witnesses—one for each party—testified at trial. Mr. March's expert, Iris Dalley, is a blood spatter analyst from Oklahoma who also served as president of the International Association of Bloodstain Pattern Analysts. She testified that there was not sufficient information

15

available to give an expert opinion as to where the stabbing occurred. According to Ms. Dalley, rather than the eight photographs that were taken, there would have to be nearly 200 photographs to determine the location of Mr. March's stabbing by blood splatter alone. Mr. Akin, a certified medical legal death investigator from Texas with 3,000 hours of training, served as Midwest's expert. In his testimony, Mr. Akin disagreed with Ms. Dalley, concluding that the blood spatters indicated that Mr. March's stabbing occurred in the alley.

In the circumstances in which the officers' testimony placing the assault in the alley was in conflict, Mr. Akin's expert opinion became essential to Midwest's case as the jury had to decide which expert to believe. Considering the fact that Ms. Dalley testified that an expert opinion was impossible due to the penury of recorded evidence, the jury must have concluded that Mr. Akin's testimony was more credible than hers. The trial court's observations about this matter are helpful. According to the trial court, Mr. Akin's false testimony:

> gave him an impressive credential and obviously was something that would be expected to be considered significant by the jurors as they evaluated [Mr.] Akin's qualifications to give his expert opinion in this case, and the weight and value to be given to his testimony. His testimony made an immediate and favorable impression on the Court, and it no doubt also made a similar impression on the jury.

Because Mr. Akin's expert opinion was essential to proving the material fact that the accident did not occur on Midwest's property, his testimony pertaining to his credentials as an expert was material to the outcome of the case because the trial court found that the jury was persuaded to accept Mr. Akin's opinion that the assault occurred

16

in the alley based on those credentials.  Therefore, the trial court did not abuse its discretion by granting a new trial on the basis that Mr. Akin falsely testified regarding his credentials.

Midwest next argues that, even if Mr. Akin's testimony was false and was material to the case, a jury verdict cannot be overturned unless there is a conviction of perjury or unless the prosecution of perjury has been thwarted by the death of the declarant.  As support, it cites two cases decided by the court of appeals: *Butts v. Express Personnel Services*, 73 S.W.3d 825, 842 (Mo. App. 2002) and *Atlas Corp.,* 962 S.W.2d at 930. Midwest's reliance on those cases, however, is misplaced.

*Butts* and *Atlas Corp.* cite this Court's decision in *Sly v. Union Depot Ry. Co.*, 36 S.W. 235, 238 (Mo. 1896), and are the only two cases to rely on that opinion for the purpose Midwest proposes.  In *Sly*, the plaintiffs moved for a rehearing, alleging that witnesses for the defendant had committed perjury.  *Id.* at 237.  The trial court in that case expressly overruled that motion, and this ruling was reviewed on appeal.  *Id.* at 238. In reviewing the trial court's ruling, this Court required that "the court in which the motion is made must be satisfied of the truthfulness of the charge, and that an improper verdict was occasioned thereby."  *Id.*  Then, after reiterating that granting a new trial rests largely at the discretion of the trial court, the Court noted that "[i]t has been held that a verdict obtained by perjury will not be set aside unless the witness has been convicted of perjury, or has died since the trial, and his conviction thus rendered impossible."  *Id.*  It then noted that there was no evidence that any witness who testified for the defendant had been convicted of perjury or had died since trial.  *See id.*

17

The statement in *Sly* requiring a perjury conviction or death of the witness before granting a new trial on the ground of false testimony was articulated nearly 120 years ago. *See Id*. No decision of the Court since 1896 has required a conviction of perjury or the death of the witness. Instead, the Court has required only that the record of the cases show that perjury had been committed and that an improper verdict or finding resulted therefrom. *See Hancock, 100 S.W.3d 786, 801; Neal*, 229 S.W. 215, 219; *Donati,* 216 S.W.2d 519, 522; *Pitzman's Co.*, 93 S.W.2d 920, 922. In light of the decisions of this Court for more than 90 years, a perjury conviction is not required for a trial court to grant a new trial based on false testimony. Any holding to the contrary in *Atlas Corp.* and *Butts* is overruled.

Because the Court's finding that the trial court did not abuse its discretion in granting Mr. March's motion for a new trial on the ground that Mr. Akin provided perjured testimony is dispositive, it is unnecessary to determine whether the trial court erred in granting a new trial as a result of newly discovered evidence.

## Conclusion

The evidence does not clearly demonstrate that the trial court abused its discretion in finding that Mr. Akin willfully and deliberately testified falsely about a material fact and that an improper verdict was occasioned by the perjured testimony. Therefore, this Court affirms the trial court's judgment.

_____
PATRICIA BRECKENRIDGE, JUDGE

All concur.

18