

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| IN RE: THE ADOPTION OF CARL LEE DEBRODIE, | WD77236 |
| Respondent, | OPINION FILED: |
| BRYAN KEITH MARTIN AND MARY ELIZABETH MARTIN, | OCTOBER, 28 2014 |
| Appellants | |
| v. | |
| KAREN DIGH ALLEN, | |
| Respondent. | |

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Jon Edward Beetem, Judge**

**Before Division One: Thomas H. Newton, P.J., Lisa White Hardwick, Anthony Rex Gabbert, JJ.**

Bryan Keith Martin and Mary Elizabeth Martin (the Martins) appeal the circuit court's judgment denying their petition to adopt Carl Lee DeBrodie, an incapacitated and disabled adult. The Martins' petition to adopt Carl was first before us in *In re DeBrodie*, 400 S.W.3d 881 (Mo. App. 2013). Therein, we reversed the circuit court's judgment which we determined erroneously concluded that, because Carl was not capable of consenting to the adoption and his legal guardian refused to provide consent, the court could not consider the fitness and propriety of the adoption. We remanded the matter back to the circuit court to consider the fitness and propriety

of the adoption. On remand, the circuit court heard additional evidence and, thereafter, denied the Martins' petition for adoption on the grounds that they failed to establish by clear and convincing evidence the fitness or propriety of the adoption or that the welfare of Carl demanded that the adoption be granted. The Martins appeal.[1]

We will affirm the circuit court's judgment in an adoption proceeding unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We review questions of law *de novo*. *March v. Midwest St. Louis*, 417 S.W.3d 248, 256 (Mo. banc 2014).

The Martins assert two points on appeal. First, they contend that the circuit court erred in requiring a clear and convincing standard of proof. They argue that, because grounds for termination of parental rights are not issues in an adult adoption, which requires neither parental consent nor joinder of any parent as a party, the applicable standard of proof is preponderance of the evidence. Second, the Martins contend that the court erred in denying Carl the benefit of adoption because in determining that the Martins did not prove that Carl's welfare demands that they be allowed to adopt, the court misapplied the adoption law to the evidence and to its own findings. We affirm.

The United States Supreme Court has stated that "the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed

---

[1]We note that the guardian ad litem (GAL) asserts three points on appeal as a Respondent, all of which support the Martins' position on appeal. Two of the points coincide with the Martins' two points, and the GAL raises one separate point of error. Although Section 453.025.4, RSMo Cum. Supp. 2013, gives the GAL the authority to initiate an appeal, there is no indication in the record that the GAL filed a notice of appeal pursuant to Rule 81.04 thereby initiating a separate appeal or a cross-appeal. As a Respondent, the GAL is entitled to respond to the Martins' points but is not entitled to raise separate points. Therefore, we address the Martins' points herein and consider the GAL's points as responsive to those points.

between the litigants." *Santosky v. Kramer*, 455 U.S. 745, 755 (1982).  In cases involving individual rights, the standard of proof is deemed a reflection of the societal value placed on individual liberty.  *Id.* at 756.  The High Court considers the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), when determining whether a particular standard of proof in a particular proceeding satisfies due process.  *Id.* at 754.  The factors to be considered are:  the private interests affected by the proceeding; the risk of error created by the standard; and the countervailing governmental interest supporting use of the standard.  *Id.*

In *Santosky v. Kramer*, the United States Supreme Court applied the *Eldgridge* factors to determine the minimum standard of proof necessary for the State to terminate parental rights.  *Id.* at 758.  *Santosky* discussed that the Court historically mandates "an intermediate standard of proof – 'clear and convincing evidence' – when the individual interests at stake in a State proceeding are both 'particularly important' and 'more substantial than mere loss of money.'" *Id.* at 756 (*quoting Addington v. Texas*, 441 U.S. 418, 424 (1979)).  In evaluating the three *Eldridge* factors, the Court concluded that use of a preponderance of the evidence standard was inconsistent with due process in termination of parental rights proceedings because "the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing governmental interest favoring that standard is comparatively slight."  *Id.* at 758.  The court noted the "historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment" and determined that only clear and convincing evidence, or something higher, can satisfy the Due Process Clause when parental rights are terminated by the State.  *Id.* at 753, 769.  The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

3

Consistent with *Santosky*, for minors sought to be adopted in Missouri pursuant to Chapter 453, where there is no consent there must first be termination of parental rights by clear and convincing evidence that grounds exist to terminate parental rights. § 453.030, RSMo Cum. Supp. 2013; § 453.040, RSMo 2000; *Adoption of C.M.B.R.*, 332 S.W.3d 793, 819 (Mo. banc 2011).[2] We presume that, "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Santosky*, 455 U.S. at 760. We recognize that, "termination of parental rights does not merely sever the rights of the parent to the child, but also severs the child's right to the parent." *In Interest of R.A.S.*, 826 S.W.2d 397, 401 (Mo. App. 1992). Therefore, we presume at the fact-finding stage of the termination of parental rights proceeding that "'the interests of the child and his natural parents coincide to favor use of error-reducing procedures.'" *In re B.H.*, 348 S.W.3d 770, 776 (Mo. banc 2011) (quoting *Santosky*, 455 U.S. at 760-761.) Thus, as the parent's and child's liberty interests coincide at this stage, the clear and convincing standard of proof simultaneously protects the parent's and child's liberty interest in preserving familial bonds. After a parent is proven unfit and the presumption for family preservation has thereby been rebutted, we then engage in a second inquiry as to whether permanent severance of that bond is in the best interest of the child. *B.H.*, 348 S.W.3d at 776. This determination need only be supported by a preponderance of the evidence. *Id.*

---

[2] A party may, in essence, waive consent to the adoption by failure to defend. § 453.040(5). Where a party desires to withdraw consent, that party must prove by clear and convincing evidence that the consent was not freely and voluntarily given. § 453.030.6. Where the person sought to be adopted is an adult with the ability to consent, that adult's consent alone is sufficient. § 453.030.10. Where the person sought to be adopted is an adult without the capacity to consent, the court may consider the fitness and propriety of the proposed adoption without any consent. *DeBrodie*, 400 S.W.3d at 889.

Here, the Martins argue that, because Carl is an adult and termination of parental rights is unnecessary, there should be no presumptions in favor of preserving the legal relationship with the biological parent which is rebuttable only by clear and convincing evidence. They argue that the adoption of a mentally incapacitated adult need only be supported by a preponderance of the evidence that the adoption is in the adult's best interest.

This, however, makes an unacceptable presumption. It presumes that the mentally incapacitated adult adoptee has less of a liberty interest in preserving biological bonds than minor adoptees, the parents of minor adoptees, or adult adoptees with the capacity to consent. We cannot agree with this presumption and find that, because the court's inquiry into the fitness and propriety of the adoption of a mentally incapacitated adult requires simultaneous consideration and protection of that adult's liberty interest in preserving biological ties, clear and convincing proof of the propriety of the adoption is necessary to protect that interest. Consideration of the factors delineated in *Eldridge* support this conclusion.

*Eldridge* first instructs that we consider the private interests affected by the proceeding when determining the appropriate standard of proof for that type of proceeding. Here, the State is not a party seeking to sever Carl's familial ties, a third party has petitioned to do so.[3] Although we recognize that standard of proof determinations are based on the generality of cases and not the rare exceptions, a glimpse into Carl's relationship with his birth mother evidences that biological ties remain a significant private interest for mentally incapacitated adults. *See Santosky*, 452 U.S. at 757.

---

[3]The State, acting in its *parens patriae* capacity as Carl's legal guardian under the probate code, contests the adoption.

Carl lived with his mother, who also has mental limitations, until he was approximately 12 years old. At the time of the final hearing on his adoption which took place on August 29, 2013, Carl's mother visited him at least once a month, more if transportation allowed, and engaged in weekly telephone conversations with Carl. Carl references his mother as "Momma." Carl and his mother share an undisputed affectionate bond. Carl exhibits excitement when his mother is scheduled to call or visit and asks for his hair to be done or to put on special clothing. He cries when she is unable to visit. Carl's father is deceased. Carl receives a monetary death benefit from a deceased relative, however the record is unclear as to what relative this benefit is derived from.

Adoption by the Martins of Carl would completely sever all legal ties between Carl and his birth mother and any claims Carl might have to death benefits from biological relations. While one could hope that the Martins would facilitate contact between Carl and his mother if the Martins acquired complete control over decision making for Carl, they would have no legal obligation to do so.[4] While Mary Martin (Mary) testified to a willingness to maintain Carl's relationship with his mother, she also testified that she did not pursue guardianship of Carl at the time the Callaway County Circuit Court appointed the public administrator as guardian, in part so she would not "have to deal with his parents anymore." At the time of the final hearing on the Martins' petition for adoption, the Martins had not visited Carl for nearly two years. Although the Martins resided in Holt's Summit when they filed the adoption petition, a close distance from Carl who resides in Fulton, at the time of the final hearing the Martins had moved 60 miles south of Kansas City, a considerable distance from Carl and his mother.

[4]Section 453.080.4, RSMo Cum. Supp. 2013, states that "[u]pon completion of an adoption, further contact among the parties shall be at the discretion of the adoptive parents."

After consideration of the private interests affected in an adoption proceeding involving a mentally incapacitated adult, we conclude that mentally incapacitated adults have a significant liberty interest in protecting their intact familial ties from interference by a third party. This interest may take on a different character than that of a minor or the parent of a minor, but is equally significant. Protection of this interest weighs in favor of a heightened standard of proof.

*Eldridge* next instructs us to consider both the risk of erroneous deprivation of private interests resulting from use of a mere preponderance standard and the likelihood that a higher evidentiary standard would reduce that risk. *Santosky*, 455 U.S. at 761. Here, unlike a termination of parental rights proceeding where the proceeding is an adversary contest between the State and the natural parents, the parties whose private interests are at risk are the prospective adoptive parents and the prospective adoptee. The relevant question, then, "is whether a preponderance standard fairly allocates the risk of an erroneous factfinding between these two parties." *Id.* Application of a "preponderance of the evidence standard indicates both society's minimal concern with the outcome, and a conclusion that the litigants should share the risk of error in roughly equal fashion." *Id.* at 756 (internal quotations and citations omitted). "A heightened standard does not decrease the risk of error, but simply reallocates that risk between the parties." *Cooper v. Oklahoma*, 517 U.S. 348, 366 (1996).

*Santosky* discusses at length how parents in a termination of parental rights hearing have less litigation power than the State and, consequently, there is greater risk of faulty fact-finding which weighs in favor of a standard of proof higher than preponderance of the evidence. In reviewing the statutes, we find that a mentally incapacitated adult may have even less litigation power in an adoption proceeding than parents have in a termination proceeding. Indigent parents in a termination proceeding have the right to appointed counsel and "'[a] parent must make a

7

clear and unequivocal waiver on the record of his or her decision to proceed to trial without a court appointed attorney.'" *In re D.P.P.*, 353 S.W.3d 697, 701 (Mo. App. 2011) (quoting *B.L.W. v. Elmore*, 723 S.W.2d 917, 920 (Mo. App. 1987). There is no requirement in the statutes that the court appoint a guardian ad litem to represent a mentally incapacitated adult adoptee's interests. Section 453.025 requires appointment of a guardian ad litem only where the person sought to be adopted is under eighteen years of age and when the parent of the minor adoptee is a minor or incompetent. Rule 52.02(k) provides that the court "*may* appoint a next fried or guardian ad litem" for a "mentally or physically infirm" individual in any litigation. However, if the court declines, the proceedings can only be invalidated by a post-litigation finding that the person's interests were not adequately protected. Rule 52.02(m). Further, not all mentally incapacitated adults have a legal guardian who might be expected to weigh in on the proceeding. According to the record, Carl had no legal guardian for several years after he became an adult.[5] Consequently, a mentally incapacitated adult could potentially be unrepresented in an adoption proceeding. In such a case, the weight of the evidence would naturally favor the petitioners and the potential for an erroneous decision would be greater with a preponderance standard. A higher standard of proof would reduce that risk.

The Martins argue that they, too, have private interests at stake because denial of the adoption prevents them from becoming Carl's legal parents. They argue that, if they were Carl's legal parents, they could seek guardianship of Carl and would be entitled to preferential appointment pursuant to Section 475.050.1(3), RSMo 2000. Adoption, they contend, would allow them to be greater advocates for Carl.

---

[5]We are cognizant, however, that incapacity would first have to be proven in an adult adoption to avoid the necessity of consent.

We cannot ignore that, prior to pursuing adoption of Carl in Cole County, the Martins sought successor guardianship of Carl in Callaway County and were denied.[6] Practically speaking, the Martins argue that the Cole County Circuit Court should have allowed Carl's adoption so as to provide the Martins more leverage to compel the Callaway County Circuit Court to award them guardianship. We are not convinced that this represents a cognizable liberty interest. Regardless, it is clear that if a third party petitioner has any private interests at stake in the adoption of a mentally incapacitated adult, the petitioner has less to lose than the mentally incapacitated adult if an erroneous determination is made. While denial of the adoption may deprive the petitioner of control, or the potential for control, over the mentally incapacitated adult, in an appropriate case that same control can be obtained in a guardianship proceeding. While the petitioners, as here, indicate a desire to make the mentally incapacitated adult a legal heir via adoption, the petitioner can always accomplish this through a properly executed will. Upon adoption, however, the mentally incapacitated adult loses all intestate rights to inherit from biological relation and loses any other benefits associated with the former relations. Adoptions are final and irrevocable. *See Santosky*, 455 U.S. at 759. Consequently, a preponderance standard of proof which equally distributes risk among the parties does not fairly allocate the risk of an erroneous decision in the adoption of a mentally incapacitated adult.

*Eldridge* also dictates that we consider the countervailing government interest in using the proposed standard of proof. Here, while the State may very well retain a *parens patriae* interest in ensuring the welfare of the mentally incapacitated adult which would weigh in favor

---

[6]Although both the Martins and Carl resided in Callaway County when the adoption petition was filed, the Martins filed their petition to adopt in Cole County pursuant to Sections 453.010.1(2) and (4), RSMo Cum. Supp. 2013, which allow for venue in the county where the child was born or "[e]ither birth person resides." Venue would have also been proper in Callaway County pursuant to Sections 453.010.1(1) and (3) which allow for venue where the person seeking to adopt resides or the child is located at the time of the filing of the petition.

9

of avoiding an erroneous decision and applying a higher standard of proof, the State is not a party and has not imposed a standard of proof that it defends.

After consideration of the guidelines for determining an appropriate standard of proof as set forth in *Eldridge*, we conclude that the private interests of the mentally incapacitated adult adoptee that are implicated in an adoption are significant and the risk of error from using a preponderance standard is substantial. Consequently, we find that the circuit court did not err in requiring clear and convincing proof that the Martins' adoption of Carl was fit and proper. Point one is denied.

In their second point on appeal, the Martins contend that the circuit court erred in denying Carl the benefit of being adopted by them because in determining that they failed to prove that Carl's welfare demands that they be allowed to adopt, the court misapplied the adoption law to its own findings and the evidence because the court found the Martins fit to be adoptive parents, to clearly have a significant relationship with and affection for Carl, and to be more than willing to advocate for him. The Martins contend that, the court based its judgment on immaterial reasons, including lack of proof that Carl would desire to terminate his legal parent-child relationship with his biological mother and that, the Martins have engaged in continued disputes with Carl's legal guardian.

In the light most favorable to the court's ruling, the facts show that Carl was born on November 18, 1985, and lived with his biological mother until he was approximately 12 years old. In September of 1999, the Cole County Circuit Court appointed Mary to be Carl's legal guardian when he was nearly 14 years old. He was considered a special needs child. This appointment came after the court determined that grounds for terminating the parental rights of Carl's mother existed, but that termination of parental rights was not in Carl's best interest.

10

Mary served as Carl's legal guardian until he turned 18. She testified in the adoption hearing that she continued to care for Carl until he turned 21. Mary testified that at that time she worked two jobs and had no way to take care of Carl because he did not go to school during the day. Consequently, he went to live at "Brady House." Approximately six to nine months later, Carl went back to live with his mother. On January 9, 2008, Carl was adjudged to be an incapacitated and disabled adult in the probate division of the Circuit Court of Callaway County. The Public Administrator of Callaway County, Karen Digh Allen, was appointed his legal guardian. Mary testified that she did not seek guardianship of Carl at that time because she did not understand the laws and she thought that if Callaway County was his guardian, she would not personally "have to deal with his parents anymore" but that she could still see him, get him, and do everything she had done before. She testified that she was mistaken in this assumption.

On August 20, 2009, Mary petitioned the Circuit Court of Callaway County to be named Carl's successor guardian. The court held hearings on the petition and, on April 19, 2010, the court denied the petition. On August 3, 2011, the Martins petitioned the Circuit Court of Cole County to adopt Carl.

Jana Oestreich, Carl's guardian ad litem for Carl's probate case, testified that she opposed the adoption. She testified that she had participated in two previous hearings related to Carl, one in 2008 when the public administrator was appointed Carl's guardian, and one in 2010 when Mary applied for guardianship. She testified that, when she was first appointed to represent Carl in 2008, he was living with his mother. In 2010, Carl was living at Second Chance in Millersburg. Oestreich testified that she observed a tremendous positive change in Carl after he went to live at Second Chance. She testified that, when she met with Carl at his mother's home, she observed him chain smoking and "just pacing and pacing and pacing." At Second Chance,

he appeared happy and looked healthy and robust. Oestriech found Carl's living environment to be very cozy and comfortable. She testified that he lived in a very orderly, tidy home with two or three bedrooms, a living room, and a back porch. She testified that it was very pleasant to see that Carl's living environment at Second Chance was "a normal looking family home" and not at all institutionalized. She testified that Carl's home has riding lawn tractors that Carl puts hay in to help feed cows. Oestreich testified that Carl appeared to be very settled at Second Chance and that Second Chance had worked hard to get him to quit smoking.

Oestreich testified that, she visited the Martins' home in 2010 when Mary applied for guardianship. She testified that she opposed Mary's petition for successor guardianship because she believed Carl was safer at Second Chance Homes. She testified that Carl can be very tiring and may require around the clock care and the staff at Second Chance works in shifts and gets rest. She testified that the Martins had a couple of young boys at the home who were running around "kind of very chaotic." She testified that "there is a lot of traffic inside of Mary's home with different children, different family members, and I'm not sure that type of environment is the secure and stable environment that someone with Carl's needs is best suited." She testified that Mary smoked a lot and that she was concerned that Carl will want to smoke again if he is around someone who smokes routinely. She testified that she believes that Mary loves Carl, but that he is a severely mentally handicapped young man that needs a highly structured setting.

Oestreich testified that, during the guardianship proceedings, Mary would say that she was going to find out information regarding placements, job opportunities, schools, or workshops for Carl, but never produced any records or specific information and never followed through with her assertions. Oestreich testified that she doubted Mary's ability or faithfulness to enroll Carl in programs where he would be best suited.

Oestreich testified that, in 2010, Mary made allegations of abuse against Second Chance. She testified that she viewed the photographs Mary took of Carl and did not observe any bruising indicative of abuse, but thought the bruising in the photographs was more likely caused by Carl bumping into things outdoors. Oestreich testified that she opposed the Martins' adoption of Carl for several reasons, including that she believed it would be best for Carl to continue his legal relationship with his birth mother, because she was concerned that the Martins' house was much less structured than Second Chance Homes, and that she did not believe the adoption to be in Carl's best long-term interests.

Sherry Paulo, a staff member and "qualified disability professional" at Carl's Second Chance Home in Fulton, testified. She testified that Carl required one-on-one staff on a daily basis. She testified that this was due to Carl doing such things as taking a toaster into his bedroom to light a cigarette and climbing on the stove to light something. She testified that Carl now has a doctor's order to not smoke because of safety concerns. She testified that Carl was visiting with his mother approximately every two weeks, but that the mother had to cancel some visits because of transportation issues and for other reasons. She testified that Carl counts down the days when he knows there is a scheduled visit, and if his mother cancels "he cries and he just wants to sleep." Paulo testified that the Martins have not been denied visitation, but they have been told that the visits need to be supervised. She testified that Carl came home lethargic from a visit with the Martins on one occasion and it was discovered that he had not been given his medication. She testified that, after a visit with the Martins on December 16, 2011, Carl returned to Second Chance with a cigarette and lighter in his pocket. She testified that, at some point that same day he had a bowel movement in his adult diapers that staff had to clean up upon his

13

return.[7]  Paulo testified that Carl has been diagnosed with MRSA, an apparent communicable infection, and staff has to be diligent in making sure Carl is properly cleaned.  She indicated that wearing the adult diapers is Carl's choice, as he has underwear and "Attends" to choose from, but he chooses the Attends.  She testified that "[h]e has a tendency of sticking his hands down his pants quite a bit and he'll pull BM out of the pants and smear on the walls on the beds, and that is a lot of the reasons for the Attends."

Cynthia Smith testified at the adoption hearing that she is employed by the Callaway County Special Services and it is her job to supervise and enforce regulation of any program with Department of Mental Health funds.  She testified that she is aware that Carl receives Social Security disability benefits and that those benefits recently increased due to a death benefit derived from a relative.  She testified that Carl would likely no longer be eligible for that benefit if his legal relationship to his birth parents was severed.  Smith testified that, along with MRSA, Carl has a history of PICA which involves eating items that are not food.  She testified that he once ate a battery.  She testified that she does not believe that a less restrictive host home, as opposed to his present placement, is in Carl's best interest.  She testified that her agency services central Missouri, and the Martins' new residence is in the Kansas City regional office area.  She stated that if Carl were adopted by the Martins, the support coordination of Carl's case would transfer to ensure that his basic are needs are met, but it would be difficult to get funded services that are stopped restarted.

Karen Digh Allen, Carl's legal guardian, also testified.  She testified that she became Carl's legal guardian in 2008.  She testified that Mary's behaviors have caused a lot of the

---

[7]The Martins and the Martins' attorney who returned Carl to Second Chance that day deny observing Carl with any lighter or cigarette and deny smelling anything suggestive of a bowel movement.

14

professionals involved in Carl's case to feel that Mary was often "stirring the pot" by getting Carl's mother upset, having the mother call, and causing problems in general. Allen testified that her office has tried to be neutral and objective, however. She testified that the "team" involved in Carl's case management determined that Carl's visits with Mary should be supervised, in part because when he returned from visits with Mary he exhibited strange or distressful behaviors.

Mary testified that she desires to adopt Carl to legally establish the relationship she believes she already has with Carl. She testified that he needs an advocate, and "needs somebody to watch out for him for the rest of my life." Mary testified that Carl loves his birth mother and looks forward to visiting with her. Mary testified that she told Carl's mother that she will receive more visitation with Carl if the Martins are allowed to adopt. Mary testified that she does not want Carl living at Second Chance. She testified that she believes Carl is overmedicated and is concerned that he now wears adult diapers when he never did before. Mary testified that she works for a program called Missouri Mentor that has "host homes" where a person with disabilities lives with a family. She testified that she would look for a setting such as that for Carl. She testified that she ceased visiting Carl at Second Chance because she does not trust Second Chance.

Mary testified that, prior to the hearing on her guardianship petition she alleged that Carl had bruises indicative of abuse. On another occasion she assisted Carl's mother in placing a hotline alleging that Carl had been abused. She testified that she has been unable to visit Carl since she "hot lined them for abuse." She testified that she understands that by adopting Carl she will not have guardianship of Carl, although it appears from the record that she hopes to obtain guardianship of Carl after the adoption. When asked if she desired to adopt only if she could also obtain guardianship she first responded, "No" and then testified, "It – I don't know." When

15

Mary was asked if she would visit Carl if guardianship remains with the Callaway County Public Administrator and Carl continues to reside at Second Chance, Mary responded: "I can't visit him because they say things that aren't true which would hurt me in a guardianship." At the date of the final hearing on August 29, 2013, the Martins had not visited Carl since December 16, 2011. At that final hearing, Mary testified that she and her husband had moved 60 miles south of Kansas City onto a family farm as she needed to help take care of her father. This move places the Martins several hours distance from both Carl and his mother.

Bryan Martin (Bryan) testified that he shared in his wife's desire to adopt Carl and testified that he loves Carl as a son. Bryan testified that, as a truck driver, he is often absent from the home a week to 10 days at a time. He alternates from being home for a week to 10 days and then absent for the same period of time. He acknowledges that Mary would be "taking the lead" in Carl's care because of Bryan's frequent absence from the home.

Mary Beck, Carl's guardian ad litem (GAL) for the adoption, recommended that the court grant the adoption. She indicated that she believes that Carl really values the role of his biological mother and the Martins in his life. In reference to the Martins moving quite a distance from Carl and his mother, she stated that Callaway County continues to have two 10 or 12-year-old foster boys in the Martin home, and Mary brings the boys to Callaway County to visit their mother. She indicated that if the adoption occurred, and apparently assuming that Carl would move in with or near the Martins, Mary could bring Carl back to visit his mother as well. She stated that she does not know that an adoption will change anything for Carl because of Callaway County's continued legal status as guardian, but recommended that the court grant the Martins' petition for adoption.

16

The circuit court denied the adoption. In its judgment, the court stated that, because Carl's consent was not required for the adoption and because Carl could not express his preference between maintaining the legal nature of his biological parentage and creating a new legal relationship by virtue of an adoption, the court was required to consider other evidence to ensure the propriety of the adoption. The court concluded that the Martins failed to establish by clear and convincing evidence the fitness or the propriety of the adoption or that Carl's welfare demanded the adoption.

On appeal, the Martins contend that the court misapplied the law to the findings and the evidence by denying the adoption after finding the Martins to be fit to adopt and to have a significant relationship with and affection for Carl with a willingness to advocate for him. The Martins argue that, the court based its judgment on immaterial reasons, including lack of proof that Carl would desire to terminate his legal relationship with his biological mother and that continued disputes between the Martins and Carl's legal guardian do not advance Carl's best interest. We find no error.

In the adoption of a minor, the court must consider the "child's wishes, feelings and attitudes regarding the adoption," even when the minor's "consent" to the adoption is not required. § 453.025.4(3).[8] It stands to reason, then, that the court cannot be faulted for considering similar evidence for a mentally incapacitated adult. Here, the court considered the available evidence and accurately noted that the evidence was not clear with regard to Carl's wishes. The GAL interviewed Carl at his home at Second Chance. In that interview, the GAL asked Carl if he wanted to continue living at Second Chance or if he wanted to live with the Martins. Carl pointed to the ground next to where he was sitting and said, "Here." The GAL

---

[8]A competent minor 14 years old or older must consent to be adopted. § 453.030.2.

17

again interviewed Carl when he was visiting the Martins. The GAL again asked Carl where he wanted to live and Carl said, "Here. Home." Carl was not asked about his desire to terminate his relationship with his biological mother. As adoption completely severs the legal relationship between an adoptee and his or her biological parent, and the adoptive parents have no legal obligation to facilitate ongoing communications with the biological parent post-adoption, it was not improper for the court to consider evidence of Carl's wishes regarding terminating his parental relationship and/or creating a new legal relationship with the Martins. Further, it was not improper for the court to consider that the Martins have engaged in "continued disputes with the legal guardian" and that those disputes may not have served Carl's best interests. Carl is a ward of the probate court of Callaway County and would remain so, at least initially, if the Martins were to adopt Carl. Thus, it was relevant to consider whether adoption by the Martins was in Carl's best interest where the prospective adoptive parents have a strained relationship with Carl's legal guardian.

The Martins also argue that, because there is a presumption in guardianship proceedings that parents be appointed guardian because parents have a greater interest in the well-being of the incompetent's welfare and have love, concern, and affection for the individual, "de facto" parents, such as the Martins are to Carl, should be afforded the same preference in adoptions. The Martins and the GAL argue that the court misapplied the law and evidence in denying the adoption because the Martins intend to provide Carl with a loving family and to advocate Carl's placement in a less restrictive environment.[9] The GAL considers this a "case of first impression as to what findings are necessary or sufficient for an adoption to be in the best interest and

_____

[9]The GAL argues that Carl currently resides in a residential institution where visits from the Martins are prohibited. However, the evidence reflects that, although governed by staff, Carl resides in a homelike independent living setting where the Martins have chosen not to visit.

18

welfare of an incapacitated adult" but advocates that "loving family" and "least restrictive environment" are paramount considerations that the court failed to acknowledge.

First, the court was under no mandate to apply a generalized "best interest of the disabled adult" standard – the court's obligation was to consider Carl's best interests. Second, the record does not reflect that the court rejected the GAL's "least restrictive environment" and "loving family" arguments, but rightly acknowledged that Carl's living environment is presently dictated by the probate division of the Circuit Court of Callaway County and adoption will not change that unless or until that court releases jurisdiction. Carl's legal guardian who was appointed by that court is already under a mandate, pursuant to Section 475.120.3(1), RSMo 2000, to ensure that Carl "resides in the best and least restrictive setting reasonably available." An adoption proceeding is not a proper forum to contest or appeal those determinations.

While "the least restrictive environment" and "loving family" are appropriate considerations for the court when determining if an adoption might be in the best interest of a mentally incapacitated adult, these considerations are not controlling. The court accurately recognized Carl to be an adult who no longer needs parents to "raise" him. This was relevant in considering Carl's best interests because, while the least restrictive environment for a child may presumptively be a family home, a family home may or may not be the least restrictive setting for an adult. Clearly, a twenty-nine year old adult without mental limitations might find living at home with a parent to be more restrictive than living independently -- in an apartment, with a roommate, with access to a job and the community.

The idea that developmentally disabled adults are to be treated as much as possible like nondisabled adults is supported by federal legislation that encourages "individualized supports" for the developmentally disabled to enable that individual "to exercise self-determination, be

19

independent, be productive, and be integrated and included in all facets of community life." 42 U.S.C.A. § 15002 (16). Thus, we cannot presume that what is best for a child is best for a mentally incapacitated adult. The proper inquiry here is what is best for Carl. We view the evidence in the light most favorable to the judgment, assume that all fact issues were resolved in favor of the judgment entered, and defer to the trial court even if the record might support a different conclusion. *Barth v. Barth*, 372 S.W.3d 496, 503 (Mo. App. 2012). We find that the circuit court's judgment denying the Martins' petition for adoption was not against the weight of the evidence and did not erroneously apply the law. Point two is denied.

We conclude, therefore, that the circuit court did not err in requiring clear and convincing evidence that the adoption of Carl was fit and proper and did not misapply the law to its findings or the evidence. We affirm the circuit court's judgment.

_____

Anthony Rex Gabbert, Judge


All concur.